IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REVEREND PATRICK MAHONEY, | ) | Civil Action |
| 4019 Duke of Gloucester | ) | |
| Fredericksburg, VA  22407 | ) | No. 1:09-cv-00105-ESH |
| | ) | |
| KAITLIN MARTINEZ, | ) | |
| 5200 Jack Eliot | ) | |
| Fredericksburg, VA  22407 | ) | |
| | ) | |
| THE CHRISTIAN DEFENSE COALITION, | ) | |
| 109 2nd Street, NE | ) | |
| Washington, DC 20002 | ) | |
| | ) | |
| SURVIVORS OF THE ABORTION | ) | |
| HOLOCAUST, a business transaction name | ) | |
| ("dba") of CRADLES OF LOVE, INC. | ) | |
| 1964 Marlborough Avenue | ) | |
| Riverside, CA 92507, and | ) | |
| | ) | |
| CHERYL CONRAD, Executive Director of | ) | |
| SURVIVORS | ) | |
| 1964 Marlborough Avenue | ) | |
| Riverside, CA 92507 | ) | |
| Plaintiffs, | ) | |
| -vs- | ) | |
| | ) | |
| THE DISTRICT OF COLUMBIA, A | ) | |
| MUNICIPAL CORPORATION, | ) | |
| 1350 Pennsylvania Avenue, NW, Suite 310 | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| CATHY L. LANIER, In her official capacity | ) | |
| as Chief of Police, METROPOLITAN POLICE | ) | |
| DEPARTMENT, GOVERNMENT OF THE | ) | |
| DISTRICT OF COLUMBIA | ) | |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001, and | ) | |

| | |
|---|---|
| JOHN DOE, In his official capacity as a police officer, METROPOLITAN POLICE DEPARTMENT, GOVERNMENT OF THE DISTRICT OF COLUMBIA 300 Indiana Avenue, NW Washington, DC 20001, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## AMENDED VERIFIED COMPLAINT

The Reverend Patrick Mahoney, Kaitlin Martinez (nee Mahoney), the Christian Defense Coalition ("CDC"), Cheryl Conrad, and Survivors of the Abortion Holocaust ("Survivors"), by undersigned counsel, herein state their Complaint and Causes of Action against the District of Columbia, Cathy L. Lanier, Chief of Police, and John Doe, a police officer of the District.

## INTRODUCTION

1.     By this Amended Verified Complaint, Mahoney, Martinez, the CDC, Cheryl Conrad and Survivors seek injunctive relief, in the form of a temporary restraining order and a preliminary injunction, barring the District of Columbia, its agents, Chief Lanier, and all those in active concert with any of them, including but not limited to officers of the Metropolitan Police Department ("MPD"), from interfering with their peaceful exercise of constitutionally protected free exercise of religion and free speech, guaranteed to the plaintiffs by the First Amendment of the United States Constitution, with their statutory right to free speech, guaranteed by D.C. Code § 5-331, the District of Columbia First Amendment Rights and Police Standards Act of 2004, and with their statutory right to free exercise of religion, guaranteed by Title 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act, as amended by the Religious Land Use and

Institutionalized Persons Act of 2000, Title 42 U.S.C. § 2000cc.

2.     Mahoney, Martinez, the CDC, Conrad and Survivors also ask this Court to declare that the conduct of the defendants violated the plaintiffs' federal constitutional and statutory rights.

## JURISDICTION AND VENUE

3.     In this action under the Declaratory Judgment Act, the First Amendment to the United States Constitution, the District of Columbia First Amendment Rights and Police Standards Act of 2004, and the Religious Freedom Restoration Act, the plaintiffs seek declaratory, equitable and such other and further relief as necessary to cure both inflicted and threatened deprivations of their federal rights, all of which have been inflicted or have been threatened to be inflicted by conduct taken by the defendants.

4.     The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343(a)(4), 2201, and 2202 and 42 U.S.C. § 1983.

5.     Venue is appropriate in the District of Columbia, in accord with 28 U.S.C. § 1391(e), because all of the acts that have been taken or that have been threatened to be taken that would constitute the injury to the plaintiffs occurred or are threatened to occur in the District of Columbia.

## PARTIES

### *THE PLAINTIFFS*

6.     Reverend Patrick Mahoney is a citizen of the United States and a resident of the Commonwealth of Virginia.

7.      Kaitlin Martinez is a citizen of the United States and a resident of the Commonwealth of Virginia.

8.      The Christian Defense Coalition is an unincorporated religious association.

9.      Cheryl Conrad is a citizen of the United States and a resident of the State of California.

10.     Survivors is a business transaction name ("dba") of Cradles of Love, Inc, a California nonprofit organization with tax exemption under section 501(c)(3) of the Internal Revenue Code.

*THE DEFENDANTS*

11.     The District of Columbia is a municipal corporation organized under the Constitution and laws of the United States.

12.     The Honorable Adrian Fenty is the mayor of the District of Columbia, and as such is responsible for executing and administering the District of Columbia's laws, customs, practices and policies.

13.     In that capacity, Mr. Fenty presently enforces the laws, customs, practices and policies complained of in this action.

14.     Cathy Lanier is the Chief of Police, Metropolitan Police Department, District of Columbia, ("MPD"), and as such is vested with authority over the operations of the MPD and its officers, including the Special Operations Division.

15.     John Doe, sued in his official capacity as a police officer with the MPD, identity currently unknown, is the police officer that, in an January 24, 2009, incident complained of herein, physically seized Reverend Mahoney, took Reverend Mahoney's personal property from him,

detained him for purposes of identification, and then released him.

## AVERMENT OF FACTS

*The Plaintiffs*

16.     Reverend Patrick Mahoney is a citizen of the United States.

17.     Mahoney is a resident of the Commonwealth of Virginia.

18.     Mahoney is a Christian.

19.     Mahoney is an ordained minister of the Reformed Presbyterian church, ordained more

than 30 years ago.

20.     Kaitlin Martinez is a citizen of the United States.

21.     Kaitlin Martinez is a resident of the Commonwealth of Virginia.

22.     Kaitlin Martinez is a Christian.

23.     Cheryl Conrad is a citizen of the United States.

24.     Conrad is a resident of the State of California.

25.     Conrad is a Christian.

26.     Mahoney and others of like mind joined together to form the Christian Defense Coalition

("CDC").

27.     The CDC is an unincorporated association of Christians involved in public activism.

28.     Survivors is a business transaction name ("dba") of Cradles of Love, Inc, engaged in

religious, pro-life activism.

29.     Cradles of Love, Inc., is a California nonprofit organization with tax exemption under

section 501(c)(3) of the Internal Revenue Code.

*The Religious Nature of the Plaintiffs' Activities*

30.     For more than 30 years, Mahoney has, as a Presbyterian minister and a Christian social activist, conducted public prayer vigils, public demonstrations, and public protests.

31.     In his ministry of public activism, Mahoney has sought to fulfill the command of the Word of God, "justice, justice shall you pursue."

32.     Using prayer vigils, demonstrations, protests and similar activities, Mahoney has pursued justice for the handicapped, for the homeless, and for the forgotten of our society.

33.     A principal focus of Mahoney's pursuit of justice in American society has been the ongoing legality of abortion, which broad policy of legality causes harm, even death to women, and nearly always causes the death of prenatal children.

34.     Mahoney has worked with, and through, the CDC to pursue justice for prenatal children and women by working toward the goal of ending legalized abortion.

35.     Kaitlin Martinez is the Program Director of the CDC.

36.     In addition to directing the activities of the CDC, Mahoney and Kaitlin Martinez work with religious organizations and pro-life organizations, and individuals around the Nation, including Cheryl Conrad and Survivors.

37.     Conrad is the Executive Director of Survivors.

38.     As Christians, Mahoney, Martinez, the CDC, Conrad and Survivors are compelled by adherence to the tenets of their religious faith.

39.     The Holy Bible is, in the religious faith of the plaintiffs, and each of them, the express Word of God, infallible, and binding upon their consciences and their manner of life.

40.     Although the plaintiffs rejoice at the sign of racial reconciliation that Barack Obama's historic election as the first African-American President of the United States signaled, they are deeply troubled by his radical support of abortion.

41.     According to the teaching of the Christian faith, in an unbroken tradition of two thousand years, abortion takes the life of a living person and violates the command, "Do no murder."

42.     According to the teaching of the Christian faith, the first duties of governments instituted by God are to reward those that do well and punish those that do evil.

43.     The plaintiffs, and each of them, is compelled by the teaching of their Christian faith, to conclude that the status of legalized abortion in the United States, puts their nation in defiance of God's order for liberty.

44.     It is that defiance of God's order for liberty, and that injustice of denying life to another without due process of law, that shocks the well-formed conscience of Christians such as are these plaintiffs, and each of them.

45.     The religious impetus and theology of Christian activism is of such nature and connection that, absent the formation of the consciences of the plaintiffs by their religious beliefs, religious values, and religious ideas, they would not seek to engage in the kind and instances of Christian social activism that are the subject matter of this dispute.

*The Christian Social Activism of the Plaintiffs During the Inaugural Festivities*
*and the Annual Commemoration of the Decision of the Supreme Court in Roe v. Wade*

46.     In anticipation of the inauguration and presidency of Barack Obama, the plaintiffs

planned and organized a series of activities and strategies under the name, the Birmingham Letter

Project.

47.     As part of that project, the plaintiffs created an internet website describing their interests,

purposes, and methods.

48.     That website is http://www.thebirminghamletterproject.com.

49.     The choice of project name deliberately recalls the letter written by Dr. Martin Luther

King, Jr., from a Birmingham jail.

50.     Dr. King's letter justified, particularly for pastors and religious adherents that had

disapproved his violation of discriminatory local laws and ordinances, his purposes and methods

in seeking social justice for African Americans.

51.     Barack Obama's tragic embrace of abortion betrays social justice and the principles of Dr.

Martin Luther King and the Scriptures:

        a.      Barack Obama opposes the ban on the barbaric Partial-Birth abortion procedure.

        b.      Barack Obama said one of the first things he wanted to do as President would be

to pass the Freedom of Choice Act which would codify abortion as a federal right, a result more

radical than the Roe v. Wade decision because it would nullify any state or federal law blocking

or restricting abortion, and invalidate any limitations the Supreme Court has put on abortion.

        c.      As an Illinois state senator, Barack Obama blocked legislation that would have

saved newborn children born alive after late term abortions.

d.      As President, Barack Obama wants taxpayer dollars to be used to pay for abortions as part of his health care plan.

e.      During the presidential campaign, Barack Obama said while speculating on the issue if one his daughters became pregnant, that he would "not want them punished with a baby."

f.      Barack Obama would only nominate judges to the Supreme Court and the federal courts that support Roe v. Wade.

g.      During the Presidential transition, Barack Obama's transition team said they would reverse an Executive Order that prohibits promoting abortion in foreign countries with financial aid provided by taxpayer dollars.

h.      In fact, during the first week of his presidency, President Obama issued an executive order rescinding the so-called Mexico City Policy that prohibited the grant of federal financial assistance to international population control organizations that provide abortion services or counseling.

52.     By supporting policies which have resulted in the deaths of 50,000,000 innocent lives, the plaintiffs, and each of them, concludes that Barack Obama fails to understand the eternal truth of "loving your neighbor as yourself."

53.     Throughout history, the people of God have always been a public prophetic witness against injustice and "spoken truth to power."

54.     The religious conscience of the Plaintiffs is informed by their examination and prayerful

study of God's Word and church history, from which they have learned, for example:

    a.    In 2 Samuel 12:1:7, the prophet Nathan confronted King David for his sin of adultery with Bathsheba and the murder of her husband Uriah.

    b.    In Mark 6:17-28, the prophet John the Baptist confronted King Herod for having an adulterous relationship with his brother's wife.

    c.    It is in that "prophetic spirit" that the plaintiffs concluded that God called the church to prayerfully challenge President Obama on his radical support for abortion.

55.    Together with Kaitlin Martinez, the CDC, Survivors, and Cheryl Conrad, Mahoney decided to use a chalk art demonstration to express prayers, thoughts, views and hopes to then-to-be President Obama on the important civil rights, political and religious issue of legalized abortion.

56.    Plaintiffs have used chalk art on many occasions previously as part of their public prayer vigils, demonstrations, protests and rallies:

    a.    The March for Women's Lives, April 25, 2004:

        i.    With the full knowledge, in advance, of the Metropolitan Police Department's Special Operations Division, Mahoney and other CDC participants used chalk to outline body shapes in the street just before the march contingents approached on Constitution Avenue and on 15th Street in the District of Columbia.

        ii.    At the time when Plaintiffs actually entered the street and engaged in the

chalk art demonstration, they were in the personal physical presence of then Chief of Police Charles Ramsey, who allowed them to carry out the activity.

b.  Sojourners Poverty Conference, week of June 1, 2007:

    i.  The Christian group Sojourners sponsored a week-long conference on poverty, here in the District of Columbia.

    ii.  As part of that conference, Sojourners conducted an assembly at George Washington University, featuring Senators Hillary Clinton, John Edwards and Barack Obama.

    iii.  Because all three of those Senators and candidates publicly support legalized abortion, the CDC, Kaitlin Martinez and Mahoney decided to conduct a prayer vigil and demonstration to proclaim the message that "Abortion is Poverty."

    iv.  Prior to the event, Mahoney communicated to representatives of the Special Operations Division of the Metropolitan Police Department the plan to include chalk art as part of the demonstration.

    v.  That plan was approved.

    vi.  During that demonstration, some members of the public that approached the venue to attend the program objected to the chalk art demonstration and tried to have it stopped.

vii.    Special Operations Division personnel on the scene at the time intervened in the situation, confirmed that Mahoney, Kaitlin Martinez and the CDC were permitted to conduct the chalk art demonstration, and kept them from being molested while they completed their demonstration.

c.    Doctor Wenyi Wang Solidarity Protest.

i.    In April 2006, Dr. Wenyi Wang was arrested at the White House during remarks by the Communist Chinese president on the White House Lawn.

ii.    Dr. Wang sought to bring attention to the plight, in Communist China, of members and adherents of Falun Gong.

iii.    Mahoney was shocked and disappointed at the treatment of Dr. Wang, and together with others, Mahoney went to the street in front of the White House, on Pennsylvania Avenue.

iv.    While at that location, with others in agreement and joining him, Mahoney wrote messages of solidarity and support for Dr. Wang and the persecuted members and adherents of Falun Gong in Communist China.

v.    At that time and at that location, Mahoney was approached by police personnel, whom he believes to have been uniformed Secret Service officers.

vi.    They allowed Mahoney, and those with him, to conduct their chalk art demonstration.

57.     January 22nd is the anniversary date of the Supreme Court's decision in Roe v. Wade.

58.     Each year on that date, thousands and thousands of Americans travel to Washington, or to

their state Capitols, to memorialize the lives lost to legalized abortion and to express continued

opposition to the civil rights wrong that legalized abortion inflicts on prenatal children.

59.     As a consequence, many like-minded individuals were in the metropolitan Washington,

DC area for the commemorations on January 22, 2009.

60.     With that in mind, Plaintiffs decided to organize and conduct their chalk art

demonstration on Saturday, January 24, 2009.

*The District of Columbia Government Permits, Encourages
and Endorses Chalk Art, and the Use of Chalk Art for Social Protests*

61.     The District of Columbia recommends that the boundaries around precinct polling places,

relevant for limits on electioneering communications, can best be indicated by drawing a chalk

line at the appropriate distance from entrances to polling places.

62.     In so recommending, the District of Columbia authorizes the use of chalk for

communications on public sidewalks in the District.

63.     The District of Columbia, through its Department of Consumer and Regulatory Affairs,

conducts an outreach campaign directed at college and university students that lease off-campus

housing in the District.

64.     On information and belief, the Department of Consumer and Regulatory Affairs

purchased 5-foot wide commercial strength stencils and removable, environmentally safe spray

chalk as part of a street level campaign to communicate information about their landlord-related

regulatory function to students attending colleges and universities in the District.

65.     On information and belief, the Department of Consumer and Regulatory Affairs used the stencils and spray chalk to post messages saying, "Students: Is your Landlord Licensed?" in a very crisp and bright image, on sidewalks adjacent to DC campuses.

66.     The contents of the official internet website of the Government of the District of Columbia are found at the URL: http://www.dc.gov.

67.     On the homepage for the DC Government website there is a small search engine that allows users to search by terms for items of interest.

68.     Entering the term "chalk" in that search engine results in a search response that links numerous documents on the DC website related to the sponsorship and conduct of chalk art contests and activities by the District of Columbia.

69.     One linked document describes the sponsorship of the Mayor's Office of Asian and Pacific Island Affairs, for the past three years, of an annual chalk art contest.

70.     One linked document references the participation and sponsorship of the Public Library System of the District of Columbia in an annual event, "Chalk4Peace" since 2005.

71.     The linked documents included registration forms for the activities, announcing dates, times, locations and, where relevant, prizes.

72.     Other linked documents include newsletters of the District of Columbia Government reporting on the successful completion of those chalk art events.

73.     The District of Columbia's website houses photographs that purport to be of participants

in the 2006, 2007, and 2008 Chalk4Peace events at the Dr. Martin Luther King, Jr., branch of the

DC Public Library system.

74.     Not only does the District of Columbia Government act as an official sponsor of,

promoter of, and participant in, chalk art events, it also tolerates open and flagrant instances of

chalk art demonstrations other than those of Plaintiffs.

75.     One recent example of such open, flagrant and tolerated chalk art demonstrations took

place during the same 2008 Chalk4Peace, on the public sidewalks adjacent to 2021 14th Street,

NW, in the District of Columbia.

76.     On that occasion, an internet café, restaurant, pub, and performance space, transacting

business as "Busboys and Poets" participated in the 2008 Chalk4Peace by sponsoring a chalk art

demonstration on the sidewalk outside the establishment.

77.     Another series of examples of open, flagrant and tolerated chalk art demonstrations are

found in an annually recurring event at George Washington University.

78.     On information and belief, the District of Columbia, its agents, servants, and/or

employees, annually grant a permit to George Washington University, which permit allows for

the closure of a city street within the campus.

79.     On information and belief, each year during the period of the street closure at George

Washington University, the University provides students with chalk and encourages them to

make chalk art designs on the city street.

80.     On information and belief, the chalk art event at George Washington University is

conducted openly and with notice to the student body and the public.

81.     The plaintiffs fear that without the aid of this Court the defendants will continue to

abridge their federal constitutional and statutory rights without legal justification.

*Pennsylvania Avenue in the Vicinity of the White House,*
*Whether Viewed as a Street or a Broad Pedestrian Promenade,*
*Is a Traditional Public Forum Property*

82.     The chalk art demonstration with its associated contemplative and prayerful witness, that

is suppressed and/or threatened to be suppressed by the District of Columbia, as described in this

Complaint, will occur or did occur on a public street, Pennsylvania Avenue Northwest, in

Washington, the District of Columbia.

83.     The precise location of the planned activity is on the street surfaces (but not the granite

slabs) of Pennsylvania Avenue, between its intersections with 15th Street NW and 17th Street

NW.

84.     Pennsylvania Avenue is continuous through the neighborhood and in the City of

Washington.

85.     That street is regularly used by the public for passage through the vicinity and in the City

of Washington.

86.     In all meaningful respects, that public street is indistinguishable from other public streets

in the City of Washington.

87.     During the administration of President Clinton, vehicular travel on that portion of

Pennsylvania Avenue was ended, causing disruption of traffic and inconvenience to the residents

of Washington.

88.     On information and belief, the project description for the conversion of Pennsylvania Avenue described the intended result as the creation of a pedestrian plaza between 15th Street NW and 17th Street NW on Pennsylvania Avenue NW.

89.     That portion of Pennsylvania Avenue now, although it still looks much like a typical street, is, in fact, a broad, pedestrian promenade that is as much a sidewalk as those public sidewalks adjacent to the United States Supreme Court and the public sidewalk adjacent to the parade route used for presidential inaugurals along Pennsylvania Avenue.

90.     On information and belief, the paving sometimes referred to as "rustic paving," found in front of the White House on Pennsylvania Avenue constitutes an aesthetically driven selection of aggregates and compounds for the creation of the paving material and omitting pigmenting binders.

91.     On information and belief, the "rustic paving" surface simply afforded government agencies responsible for the project to provide a "colored" street surface different from typical asphalt surfaces.

*Mahoney Advises Police Officials of His Plans*

92.     With these plans in mind, Mahoney contacted undersigned counsel and directed them to correspond with the District of Columbia's Metropolitan Police Department regarding his plan.

93.     In thirty years of Christian social activism and more than twenty years of Christian social activism opposing legalized abortion, Reverend Mahoney and his associates have always informed police officials of their plans and intentions to conduct prayer vigils, demonstrations

and other public protest activities.

94.     Counsel sent correspondence to the General Counsel of the Metropolitan Police Department on November 24, 2008.

95.     When no response was received regarding that correspondence, counsel sent a follow up letter on December 10, 2008.

96.     In response to that letter, General Counsel Ryan wrote and advised that the proposed demonstration was being reviewed by the MPD's Special Operations Division ("SOD").

*District Police Officials Respond to Mahoney's Contact*

97.     On January 7, 2009, Commander Crane, of the MPD SOD, prepared a letter responding to counsel's correspondence, and that letter was hand-delivered to counsel on January 8, 2009.

98.     In that letter, Commander Crane requested additional information for the development of a demonstration permit, included an application form, but stated that chalking would not be allowed for the stated reason that chalking on the streets would constitute defacing of public property in violation of D.C. Code § 22-3312.01.

99.     D.C. Code § 22-3312.01 makes it a crime within the District of Columbia to engage in enumerated activities, including "to write, mark, draw, or paint, without the consent . . . of the person having charge, custody, or control thereof, any word, sign, or figure upon . . . [a]ny property, public or private . . . ."

100.    By its own express terms, D.C. Code § 22-3312.01 provides no standards or other criteria by which District officials are to be guided in determining whether to grant or deny consent to engage in the enumerated activities.

101.    Then Mayor Anthony Williams designated the Chief of Police as his lawful representative to promulgate regulations to carry out the purposes of D.C. Code § 22-3312.01.

102.    The Chief of Police promulgated such regulations, which are found at 24 DCMR, chapter 7, sections 705-09.

103.    Those regulations purport to limit and restrict the discretion of police officials.

104.    Those regulations require and mandate the issuance of demonstration permits except where one of several specific circumstances is found to exist.

105.    Commander Crane did not refer to, apply to the chalk art demonstration, or employ as justification for the denial any of the provisions of 24 DCMR chapter 7, section 706.9.

106.    On January 9, 2009, counsel sent further correspondence to the MPD General Counsel.

107.    On January 12, 2009, after business hours, MPD SOD Lieutenant Emmerman faxed and emailed to counsel a permit for Plaintiffs' demonstration planned for January 24, 2009.

108.    The permit expressly prohibited the planned use of chalk to create messages and art as a way of expressing the religious views and opinions of the plaintiffs.

109.    Plaintiffs have used chalk art as a form of expression for many years in the District of Columbia, and also at prayer vigils and demonstrations elsewhere in the United States.

110.    One recent example elsewhere was a chalk art demonstration during the Democratic National Convention in Denver, Colorado, in August, 2007.

111.    Plaintiffs wanted to conduct the planned chalk art demonstration on January 24, 2009.

112.    Plaintiffs announced the planned demonstration and invited participants.

113.    The assertion that plaintiffs' planned activity is criminal carried with it the clear threat of

criminal prosecution.

114.    That threat chilled plaintiffs and those who would have joined them from the exercise of their rights.

*Prior Experience Cleaning Chalk Markings from Pennsylvania Avenue*
*in the Vicinity of the White House*

115.    In preparation for the 2004 Inaugural Parade, on information and belief, one or all of the National Park Service, the Presidential Inaugural Committee, the District of Columbia, or the agents and servants of one or all of them caused a painted line to be made on Pennsylvania Avenue to indicate the center line of the street for the use of guiding parade units.

116.    The National Park Service and the District of Columbia refer to that guidance line as a chalk line.

117.    On belief, the reference line was not made by marking the paved surface of Pennsylvania Avenue with a sidewalk chalk stick.

118.    On belief, the reference line was applied in liquid form and employed materials different in kind and properties from sidewalk chalk.

119.    On belief, after the Inaugural Parade, the National Park Service attempted to remove that reference line.

120.    On belief, the National Park Service discovered that the chalk line was so affixed to or embedded into the surface of the street that it became necessary to use a device known popularly as a power washer to remove the marks.

121.    On belief, the National Park Service discovered that use of the power washer caused

damage to the paving by loosening and removing paving material.

*Plaintiffs Seek Judicial Relief*

122.    Because of the threat of unlawful restriction on the exercise of the religious freedoms and freedom of expression, the plaintiffs sued the District of Columbia and the Chief of the Police Department to prevent police interference with their exercise of rights of expression guaranteed to them under the Constitution.

123.    As part of that suit, the plaintiffs applied for a temporary restraining order.

124.    After a hearing on the application, in a bench ruling, the United States District Court denied the application for a temporary restraining order.

*The Chalk Art Demonstration on January 24, 2009*

125.    On January 24, 2009, Reverend Patrick Mahoney and others with him, went to the vicinity of 1600 Pennsylvania Avenue NW, in Washington, the District of Columbia.

126.    Reverend Mahoney brought sidewalk chalk with him.

127.    Reverend Mahoney also brought cleaning supplies to remove his chalk messages and art when his demonstration was completed.

128.    Reverend Mahoney discovered that his planned demonstration was expected, and he found Commander James Crane, the head of the Special Operations Division of the Police Department, together with Captain Jeffrey Herold, and several other police officials present on the scene.

129.    Reverend Mahoney began to write a message on the paved portion of Pennsylvania Avenue, according to the announced event plans.

130.    His intention was to write, with a sidewalk chalk stick, the message: "President Obama, Stop the Violence, End Abortion Now."

131.    As Mahoney began to write, representatives of the police force and two news media representatives recorded by videotape and still photograph, his actions.

132.    As he completed the letter "P," police officials interrupted Mahoney's expressive activities.

133.    A police official, John Doe, took Reverend Mahoney's chalk from him.

134.    John Doe required Reverend Mahoney to provide his personal identification.

135.    John Doe informed him that the information and materials would be referred over to the Office of the United States Attorney for the District of Columbia for purposes of a determination of whether to prosecute him.

136.    To effect the seizure of Reverend Mahoney's chalk, and to remove him from the location of his chalk art demonstration, John Doe touched Reverend Mahoney.

137.    John Doe touched Reverend Mahoney without permission or advance warning.

138.    No legal justification existed for the offensive physical contact of John Doe with Reverend Mahoney.

139.    Mahoney requested to be permitted to clean up his chalked message, "P" from the street.

140.    Police officials refused his request.

141.    On information and belief, two hours later, Terrence Mahoney, the brother of Reverend Mahoney, returned to the place of his brother's attempted chalk art demonstration.

142.    On information and belief, Terrence Mahoney had watched as Reverend Mahoney wrote

on the paved surface of Pennsylvania Avenue.

143.     On information and belief, when he returned to the location where Reverend Mahoney

had written the letter "P," there remained absolutely no evidence of the chalk writing whatsoever

at all.

144.     On information and belief, Terrence Mahoney also observed that there was no damage

whatsoever to the street in the location as a result of the writing of, or removal of, Reverend

Mahoney's chalk message.

*Continued Injury to the Plaintiffs*

145.     Plaintiffs plan to continue to conduct prayer vigils, demonstrations, protests and related

activities in the District of Columbia regularly into the foreseeable future.

146.     That plan is not speculative or fantasy; Plaintiffs have an extended track record of using

their rights to expression, assembly, free exercise of religion, and free press here in the Nation's

Capitol for twenty years.

147.     Threats of arrests and criminal prosecutions for Plaintiffs' planned chalk art

demonstration are disturbing because the District of Columbia government actively encourages,

sponsors and supports public chalk art events on the sidewalks, streets and public properties of

the District of Columbia.

148.     On February 9, 2009, Reverend Mahoney caused, by counsel, a demonstration permit

application to be submitted for consideration and approval by the Police Department.

149.     That application, which indicates the intent of the plaintiffs to return to Pennsylvania

Avenue in the vicinity of the White House for yet another chalk art demonstration and prayer

vigil, was denied by the MPD Special Operations Division in an undated letter from Captain Burt A. Henry.

150.    The plaintiffs plan and intend to continue to use chalk art as a form of religious expression and demonstration in the District of Columbia for as long, at least, as the District of Columbia continues to maintain a statutory permitting framework under which such demonstrations are treated as lawful exercises of the right to free speech.

## AVERMENTS OF LAW

151.    The United States Constitution protects from governmental infringement the right to free exercise of religion and the right to freedom of speech.

152.    D.C. Code § 5-331, the District of Columbia First Amendment Rights and Police Standards Act of 2004, protects from governmental infringement the right to freedom of speech.

153.    Title 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act, as amended by Title 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act, protects from governmental infringement the right to religious freedom.

154.    The defendants, therefore, knew or should have known that their threatened conduct, described in the foregoing Allegations of Fact, would violate the federal constitutional and statutory rights of the Plaintiffs.

155.    The threat of criminal sanctions against Plaintiffs for engaging in a peaceful speech demonstration injures rights protected by the United States Constitution, the D.C. First Amendment Rights and Police Standards Act of 2004, and the Religious Freedom Restoration Act.

156.    There is no adequate remedy at law for the injuries threatened against the Plaintiffs.

CLAIMS OF INJURY

FIRST CAUSE OF ACTION: VIOLATION OF RIGHTS GUARANTEED
BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

*By All Plaintiffs Against All Defendants*

157.    The facts stated in paragraphs 1 through 156 are incorporated herein by reference as

though fully set out.

158.    D.C. Code § 22-3312.01 regulates the writing, marking, drawing and painting of words,

signs and figures, all quintessential forms of speech activity.

159.    D.C. Code § 22-3312.01 regulates these speech activities as they occur on public

properties, including streets and sidewalks, which constitute quintessential public forums.

160.    D.C. Code § 22-3312.01, by requiring permission prior to engaging in certain specified

speech activities in public forums, is a classic prior restraint on speech.

161.    Title 24 DCMR, chapter 7, sections 706.9, provides express and limited grounds for the

denial of applications for permits to engage First Amendment activities.

162.    The Special Operations Division of the Metropolitan Police Department ignores the

existence and strictures of the express terms of 24 DCMR, chapter 7, section 706.9.

163.    The effect of the failure to apply the discretion-limiting provision of 24 DCMR, chapter

7, section 706.9 to decisions on applications for demonstration permits is to maintain the vast,

boundless discretion of those empowered to license the right to freedom of speech.

164.    By vesting the officials who have charge, custody or control over public property in the

District with unbridled discretion to deny permission to individuals wishing to engage in certain speech activities, D.C. Code § 22-3312.01 violates rights constitutionally protected by the Free Speech Clause of the First Amendment.

WHEREFORE Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the Court grant them the relief set out below in the demand for judgment.

SECOND CAUSE OF ACTION: VIOLATION OF RIGHTS GUARANTEED
BY THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

*By All Plaintiffs Against All Defendants*

165.    The facts stated in paragraphs 1 through 164 are incorporated herein by reference as though fully set out.

166.    The public street at issue in this matter is a paradigm of the traditional public forum.

167.    The expressive activities planned by Mahoney, Martinez, the CDC, Conrad and Survivors constitute the exercise of the right to freedom of speech, and of religion.

168.    The expressive activities planned by Mahoney, Martinez, the CDC, Conrad and Survivors consist of speech constitutionally protected by the First Amendment to the United States Constitution.

169.    Although Title 24 DCMR, chapter 7, section 706.9, expressly limits the power of the police to deny demonstration applications, the Special Operations Division officers responsible for processing the chalk art demonstration requests of the plaintiffs have, either by willfulness or ignorance of the terms thereof, refused to comply with this provision of law that would cabin the otherwise unbridled discretion of the police.

170.    By threatening to apply a provision of the criminal code of the District of Columbia to the Plaintiffs' expressive activities, the defendants threaten to violate,  Mahoney's, Kaitlin Martinez's, the CDC's, Conrad's and Survivors' right to freedom of speech guaranteed by the First Amendment.

171.    The free exercise of religion is guaranteed to Plaintiffs by the First Amendment to the United States Constitution.

172.    By threatening to apply a provision of the criminal code of the District of Columbia to the Plaintiffs' expressive activities, the defendants threaten to violate,  Mahoney's, Kaitlin Martinez's, the CDC's, Conrad's and Survivors' right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution.

WHEREFORE  Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the Court grant them the relief set out below in the demand for judgment.

### THIRD CAUSE OF ACTION: VIOLATION OF RIGHTS GUARANTEED BY TITLE 42 U.S.C. § 2000bb, THE RELIGIOUS FREEDOM RESTORATION ACT

*By All Plaintiffs Against All Defendants*

173.    The facts stated in paragraphs 1 through 172 are incorporated herein by reference as though fully set out.

174.    The demonstration planned to be conducted by Mahoney, Martinez, the CDC, Conrad and Survivors are religious exercises compelled by the tenets of their religious faith.

175.    The threat of criminal sanctions for engaging in this demonstration substantially burdens the exercise of Mahoney's, Kaitlin Martinez's, the CDC's, Conrad's and Survivors' religious

faith.

176.   No compelling government interest justifies the threat of criminal sanctions here.

177.   The threat of criminal sanctions is not the least restrictive means available to secure any compelling government interest at stake here.

178.   The threat by the defendants of criminal sanctions against Mahoney, Martinez, the CDC, Conrad and Survivors for their planned demonstration has violated the rights guaranteed to Mahoney, Martinez, the CDC, Conrad and Survivors by Title 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act.

WHEREFORE Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the Court grant them the relief set out below in the demand for judgment.

### FOURTH CAUSE OF ACTION: VIOLATION OF RIGHTS GUARANTEED BY THE DISTRICT OF COLUMBIA FIRST AMENDMENT RIGHTS AND POLICE STANDARDS ACT OF 2004

*By All Plaintiffs Against All Defendants*

179.   The facts stated in paragraphs 1 through 178 are incorporated herein by reference as though fully set out.

180.   The chalk art demonstrations planned by Mahoney, Martinez, the CDC, Conrad and Survivors  constitutes a First Amendment assembly for speech activity.

181.   The application by the defendants of D.C. Code § 22-3312.01 to the planned demonstration of the plaintiffs, when District officials have previously permitted such demonstrations on public property, raises the specter of content-based discrimination in an assembly restriction, in violation of rights protected by the District of Columbia First

Amendment Rights and Police Standards Act of 2004, D.C. Code § 5-331.04.

182.    The failure entirely of the Defendants to decide whether to grant the application for the

January 24, 2009, chalk art demonstration based on the regulations adopted by the Defendants

violated the First Amendment Rights and Police Standards Act of 2004.

WHEREFORE Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the

Court grant them the relief set out below in the demand for judgment.

FIFTH CAUSE OF ACTION: VIOLATION OF EQUAL PROTECTION RIGHTS
GUARANTEED BY THE FIFTH AMENDMENT

*By All Plaintiffs Against All Defendants*

183.    The facts stated in paragraphs 1 through 182 are incorporated herein by reference as

though fully set out.

184.    The plaintiffs are similarly situated to others in the District of Columbia that have been

permitted to use chalk to create messages and images on public property, or even encouraged to

do so.

185.    There existed no constitutionally sufficient justification for the Defendants to treat the

plaintiffs differently than others that have sought to communicate by making chalk images and

messages on the District's streets and sidewalks.

186.    By their actions, the Defendants deprived the plaintiffs of their right to equal protection,

guaranteed to them by the Due Process Clause of the Fifth Amendment of the United States

Constitution.

WHEREFORE Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the

Court grant them the relief set out below in the demand for judgment.

SIXTH CAUSE OF ACTION: VIOLATION OF RIGHTS GUARANTEED
BY THE FIRST, FOURTH AND FIFTH AMENDMENT,
AND THE RELIGIOUS FREEDOM RESTORATION ACT

*By Reverend Mahoney against John Doe*

187.    The facts stated in paragraphs 1 through 186 are incorporated herein by reference as though fully set out.

188.    The interference, detention on scene, coercion of personal identification, and seizure of personal effects that took place on January 24, 2009, on Pennsylvania Avenue in Washington, DC, violated Reverend Mahoney's constitutional and statutory rights.

189.    There existed no legal justification, probable cause, compelling government interest, or use of least restrictive means, in the actions taken by John Doe against Reverend Mahoney in response to his chalk art demonstration.

190.    Because Reverend Mahoney's acts were lawful, there was no probable cause to justify arresting Mahoney's person, searching his person, or seizing his personal effects.

191.    Lacking probable cause, John Doe violated Reverend Mahoney's Fourth Amendment rights to be secure in his person and in his effects from unreasonable searches and seizures.

192.    Because the District of Columbia allows chalking as a form of expressive activity on public property when a permit is granted to do so, and because no constitutionally sufficient basis existed for denying such a permit, there was no constitutionally justification for interfering with his chalk art demonstration, seizing his effects, or detaining and or arresting him.

193.    John Doe violated Reverend Mahoney's right to freedom of speech by his actions on

January 24, 2009.

194.    Others similarly situated have been permitted and encouraged to use chalk to create messages and images on public property in the District of Columbia, by the District of Columbia.

195.    By treating Reverend Mahoney differently than others who were similarly situated, and in doing so denying him the exercise of his constitutional rights of expression and religion, John Doe violated Reverend Mahoney's right to the equal protection of the laws under the Due Process Clause of the Fifth Amendment.

196.    Reverend Mahoney's chalk art demonstration was motivated by his religious convictions and but for those religious convictions he would not have sought to create a visual message with chalk directed at President Obama.

197.    By stopping Reverend Mahoney, John Doe imposed a substantial burden on Reverend Mahoney's religious exercise, without any compelling governmental interest to be served by Doe's actions, and without employing the least restrictive means available to him to serve any affected governmental interest.

198.    John Doe violated Reverend Mahoney's rights guaranteed under the Religious Freedom Restoration Act.

WHEREFORE Reverend Mahoney respectfully prays the Court grant to him the relief set out below in the demand for judgment.

## DEMAND FOR JUDGMENT

On their foregoing causes of action, Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray that the Court grant them relief as set forth below:

199.    Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray the entry of injunctive relief _pendente_ _lite_, to secure the status quo ante.

200.    Mahoney, Martinez, the CDC, Conrad and Survivors respectfully pray that the injunctive relief take the form of injunctive orders barring the District of Columbia, Chief Lanier, John Doe and all persons in active concert with any of them who have actual notice of the terms of the injunctive orders, from denying the Plaintiffs the right to have access to the disputed public street for the purpose of conducting a peaceful demonstration, including the creation of words and images with chalk on the public ways within the District.

201.    The plaintiffs respectfully pray the entry of a declaratory judgment.

202.    The plaintiffs respectfully pray that the declaratory relief sought in the preceding paragraph take the form of a Judgment declaring that the conduct of defendants complained of herein constitutes a violation of their federal constitutional and statutory rights.

203.    The plaintiffs respectfully pray the entry of an order granting to them nominal damages reflecting the loss in fact of their constitutional and statutory rights in denial of the chalk art demonstration permit, and in the interference with the chalk art demonstration on January 24, 2009.

204.    The plaintiffs respectfully pray the entry of an order granting to them their costs, including a reasonable award of attorneys fees, pursuant to Title 42 U.S.C. § 1988.

205.    The plaintiffs respectfully pray that the Court grant such other and further relief as it deems just in the circumstances.

DATED: Tuesday, February 24, 2009

Respectfully submitted,


_____/s/_____
James Matthew Henderson Sr.
(D.C. Bar # 452639)
  *Counsel of Record for the Plaintiffs*
Carly F. Gammill (D.C. Bar # 982663)*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC  20002
(202) 546-8890

* Admitted Pro Hac Vice

## VERIFICATION OF COMPLAINT

I, Patrick J. Mahoney, on this 23 th day of February, in the year of our Lord Two

Thousand and Nine, hereby declare under the penalties of perjury of the City of Washington,

District of Columbia, that the factual statements contained in the foregoing Complaint are known

by me to be true and correct.

Reverend Patrick J. Mahoney

## VERIFICATION OF COMPLAINT

I, Kaitlin Martinez, on this ___th day of February, in the year of our Lord Two Thousand

and Nine, hereby declare under the penalties of perjury of the City of Washington, District of

Columbia, that the factual statements contained in the foregoing Complaint are known by me to

be true and correct.

Kaitlin Martinez

*Mahoney et al v. District of Columbia, et al.*, Civil Action No. 1:09-cv-00105-ESH
Amended Verified Complaint Page 35

## VERIFICATION OF COMPLAINT

I, Cheryl Conrad, on this ___th day of February, in the year of our Lord Two Thousand

and Nine, hereby declare under the penalties of perjury of the State of California, that the factual

statements contained in the foregoing Complaint are known by me to be true and correct.

Cheryl Conrad

*Mahoney et al v. District of Columbia, et al.*, Civil Action No. 1:09-cv-00105-ESH
Amended Verified Complaint Page 36

## CERTIFICATE OF SERVICE

James Matthew Henderson, Sr., a member of the bar of this Court, hereby certifies that, on

this 25th day of February, 2009,  he caused a copy of the foregoing Amended Complaint to be served

on counsel of record for the Defendants District of Columbia and Cathy L. Lanier, by depositing

same, sufficient first class postage affixed thereto, in a United States Mailbox, addressed:

> Thomas L. Koger
> Senior Assistant Attorney General
> 441 Fourth Street NW, 6th Floor South
> Washington, DC 20001

James Matthew Henderson, Sr., also certifies that on this same date he caused an electronic

version of the foregoing document to be provided by electronic mail to the same counsel of record

for the Defendants by emailing same to Thomas.Koger@dc.gov.

DATED: Wednesday, February 25, 2009

Respectfully submitted,

_____/s/_____
James Matthew Henderson Sr.
(D.C. Bar # 452639)
  *Counsel of Record for the Plaintiffs*
Carly F. Gammill (D.C. Bar # 982663)*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC  20002
(202) 546-8890

* Admitted Pro Hac Vice