**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        :
**REVEREND PATRICK J. MAHONEY,** *et al.*,   :
                                        :
         **Plaintiff,**                 :
                                        :
    **v.**                              : **Civil Action No. 09-105 (ESH)**
                                        :
**DISTRICT OF COLUMBIA,** *et al.*,         :
                                        :
         **Defendants.**                :
                                        :
_____:

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT OR,**
**IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendants, District of Columbia ("District") and Chief of the Metropolitan Police
Department ("MPD"), Cathy L. Lanier (sued solely in her official capacity), by and through
undersigned counsel, respectfully submit this memorandum of points and authorities and
accompanying exhibits in support of their motion to dismiss or, in the alternative, for summary
judgment.

Plaintiffs assert six causes of action through their Amended Verified Complaint (AVC).
On January 12, 2009, in response to Plaintiffs' request for an Assembly Approval Plan
(Approval), the MPD issued Plaintiffs an Approval for a demonstration on the 1600 block of
Pennsylvania Avenue, N.W.  This Approval provided for up to 5,000 participants in this
demonstration, over the period 7:00 a.m. to 7:00 p.m. on the date that Plaintiffs sought.  It
authorized the use of signs and banners to present whatever messages they chose to
communicate.  It explicitly prohibited the use of chalk on the roadway of Pennsylvania Avenue
of front of the White House.  Based on the issuance of this Approval and the fact that the MPD
stopped plaintiff Reverend Patrick J. Mahoney from completing chalk art that he commenced on

that roadway on January 24, 3009, without arresting him, Plaintiffs aver that the defendants have (1) violated their First Amendment rights to free speech, (2) violated their First Amendment rights, to the free exercise of religion; (3) violated their rights pursuant to the Religious Freedom Restoration Act 42 U.S.C. § 2000bb (RFRA); (4) violated their rights under both the First Amendment and the First Amendment Rights and Police Standards Act of 2004, by allegedly denying them the use of chalk art inconsistently with District municipal regulations; (5) violated their Fifth Amendment Equal Protection rights; and (6) by causing Mahoney to cease his chalk defacement of the Pennsylvania Avenue roadway, violated their rights under the First, Fourth, and Fifth Amendments and RFRA.

As explained below, the complained-of Approval merely asserted a content neutral, reasonable time, place, and manner restriction in prohibiting the chalking of Pennsylvania Avenue, N.W. in front of the White House.  For these reasons, the Approval does not violate Plaintiffs' First or Fourth Amendment rights.  Similarly, MPD's actions in requiring Mahoney to discontinue his chalking of the roadway, which he did in violation of District law and the terms of the Approval, did not violate his rights under the First or Fourth Amendments.  Further, the chalking of Pennsylvania Avenue, N.W. in front of the White House is not a religious exercise and is therefore, not subject to RFRA's protections.  Nor has any religious exercise of Plaintiffs been substantially burdened by the Approval or by MPD's actions in causing Mahoney to cease his defacement of the roadway.  Finally, MPD did not treat Plaintiffs less favorably than other similarly situated persons in issuing the Approval provided or in causing Mahoney to cease his unlawful defacement of Pennsylvania Avenue, N.W.  For these reasons, defendants are entitled to judgment as a matter of law on each and all of Plaintiff's claims.

I.      **FACTS BEARING ON THIS MOTION**

As a preliminary matter, Defendants wish to identify certain propositions that are not in dispute for purposes of this motion.  Defendants agree that the 1600 block of Pennsylvania Avenue is a traditional public forum and the expressions of Plaintiffs' beliefs are protected speech for First Amendment purposes.

Defendants, further, do not understand Plaintiffs to seriously contend that they have been denied an Approval to conduct *a* demonstration on the 1600 block of Pennsylvania Avenue – the requested place - over a 12-hour period embracing virtually every daylight minute on January 24, 2009 – the requested time – and authorized them to express their beliefs through verbal and written word (and other sounds for that matter) and graphic depiction.  *See* Ex. 6 to Plaintiffs' Motion For Temporary Restraining Order And Preliminary Injunction (TRO Motion), filed January 16, 2008 (Doc.4-12) at 2.

Thus, it is beyond reasonable dispute that Plaintiffs have not been restricted as to the time, place, or most importantly, the content of their protected speech.  Plaintiffs' Motion for a Temporary Restraining Order ("TRO Mot.") challenges only the District's application of a content-neutral manner limitation, narrowly tailored to serve a compelling government interest.

**Notification, Approval, and Actions**

On November 24, 2008, plaintiffs, through their attorney, sent a letter to the General Counsel of the MPD, advising that on January 24, 2009, weather permitting, "Reverend Mahoney and other demonstrators" "would conduct a demonstration "on the public promenade portion of Pennsylvania Avenue directly between the White House and Lafayette Park."  (AVC ¶ 94; copy of November 24, 2008 letter from James Matthew Henderson, Sr., Esquire, to Terrence Ryan submitted by plaintiffs as Ex. 1 to their Motion For Temporary Restraining Order And

Preliminary Injunction, filed January 16, 2008 (Doc. 4-8) (TRO Ex. 1)at 1-2). Plaintiffs further

advised that "Reverend Mahoney and the other demonstrators plan to create a variety of verbal

and visual messages, by making chalk drawings on the paved surface of Pennsylvania Avenue."

(DSOF ¶ 1).

The First Amendment Assembly provisions of the First Amendment Rights and Police

Standards Act of 2004 (the 2004 Act) provide that a person or group who wishes to conduct a

First Amendment assembly on a District street, sidewalk, or other public area shall give notice

and apply for approval of an assembly plan unless the assembly is to take place on public

sidewalks and crosswalks without preventing other pedestrians from using those walkways, the

organizer reasonably anticipates that the assembly will have fewer than 50 participants and will

not occur on a District street, or the assembly is for the purpose of an immediate and spontaneous

expression of views in response to a public event. D.C. Official Code § 5-331.05 (c), (d) (1)-(5).

Reverend Mahoney's planned demonstration, as reflected in the Nov. 24 letter, is not subject to

any of the Act's exemptions. (DSOF ¶ 2).

James Crane, has been the Commander of the Special Operations Division (SOD) of the

Metropolitan Police Department (MPD) since September 2007. Among Crane's duties and

responsibilities as SOD Commander is the issuance or denial of Assembly Plan Approvals for

parades and/or demonstrations on public space of the District of Columbia. His decision making

in this process is governed by the United States Constitution and the laws of the District of

Columbia, specifically including the 2004 Act. (DSOF ¶ 3).

Crane's determination whether to approve, approve with modifications, or deny an

application is governed by the requirements of the 2004 Act as well as the Constitution. In

addition to the protections of the Constitution, Section 5-331.04(c) of the Act specifically

provides that "[n]o time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities."  (DSOF ¶ 4).

Certainly, the Nov. 24 letter goes to considerable length to represent the content of beliefs planned to be expressed at the contemplated demonstration.  The representations of intended content in the various communications to MPD on Reverend Mahoney's behalf, however, did not influence Crane's decision.  Rather, Crane's decision was informed by concerns over the foreseeable destructive effects that permitting defacement by chalking of the roadway of the 1600 block of Pennsylvania Avenue, NW, would have, including over time as a result of the precedent of SOD granting the permit, as requested, by Reverend Mahoney and the District's statutory prohibition against defacing public property.  (DSOF ¶ 5).

In response to the November 24, 2008 notification of Rev. Mahoney's demonstration plan, James Crane, Commander of MPD's Special Operations Division issued an Approval.  (DSOF ¶ 6).

On January 12, 2009, MPD's Special Operations Division (SOD) transmitted to plaintiffs' counsel, by facsimile and email, an Approval in response to plaintiffs' letter dated November 24, 2008.  (DSOF ¶ 7).  The Approval stated in pertinent part:

> In accordance with the provisions of the First Amendment Assemblies Act of 2004, permission is hereby granted to Rev. Patrick Mahoney to conduct a First Amendment Assembly on Saturday, January 24, 2009 from 0700 hours (assembly time) [to] 1900 hours (disbanding time), consisting of no more than 5,000 persons.  You are permitted to possess signs and banners.  However, there is no

permission granted to use chalk or any other material to mark the surfaces of Pennsylvania Ave., NW.

The Approval was conditioned upon the following requirements:

Applicant and all participants in the assembly herein authorized must comply with all the conditions of this assembly plan approval plan and applicable regulations and instructions issued by the Metropolitan Police Department.

and

The Metropolitan Police Department reserves the right to revoke this Assembly Plan Approval at any time, should the event present a clear and present danger to public health or safety, or of any conditions of this approval plan are violated by the applicant in the assembly herein authorized.

and

It is understood that Rev. Patrick Mahoney will be in charge of this assembly and is the person that the Metropolitan Police Department should contact in managing this event.

(DSOF ¶ 7).

On January 24, 2009, Rev, Mahoney and others went to the 1600 block of Pennsylvania Avenue, NW.  Rev. Mahoney brought chalk with him.  SOD Commander James Crane, MPD Captain Jeffrey Herold, and several other police officers were present at the location when Mahoney and the persons with him arrived at the area for which Mahoney had been issued the Approval. Rev. Mahoney started to mark with the chalk on the paved portion of Pennsylvania Avenue. As Rev. Mahoney completed marking the letter "P" on the road surface in the presence of the police officers, they directed him to stop marking the roadway and took his chalk away from him.  The officers then required Mahoney to identify himself.  Portions of these events were videotaped.  A dvd reflecting portions of these events is submitted ax Ex. A.  (DSOF ¶ 8).

No such Assembly Plan Applications contemplating the marking of Pennsylvania Avenue in front of the White House, or the adjoining sidewalks, with chalk or any other substance has received an Approval under the 2004 Act.  (DSOF ¶ 9).

**ARGUMENT**

I.   **ALL COUNTS ARE PROPER FOR DISPOSITION AS A MATTER OF LAW IN DEFENDANTS' FAVOR**

A.   **The Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment shall be granted if the record in support of and in opposition to the motion show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere existence of a factual dispute, alone, is insufficient to bar summary judgment. *Id.* Only facts that are capable of affecting the substantive outcome of the litigation are "material" for purposes of Rule 56. *See id.; Laningham v. United States Navy,* 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). Moreover, the defense of qualified immunity implicates different issues than whether an individual's conduct actually complied with constitutional requirements; this, in turn, affects the determination of which facts are "material." *See Behrens v. Pelletier,* 516 U.S. 299, 313 (1996); *see also Saucier v. Katz,* 533 U.S. 194, 204-06 (2001) (qualified immunity analysis applies to all Fourth Amendment actions and is distinct from "objective reasonableness" inquiry to determine Fourth Amendment validity of conduct).

Further, genuine issues are only those based upon admissible evidence sufficient to enable a reasonable trier-of-fact to find in favor of the non-moving party. *Laningham,* 813 F.2d at 1242-43.  Hearsay evidence may not be used to support or oppose a summary judgment motion. *See Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 339 U.S. App. D.C. 354, 199 F.3d

1365, 1369 (D.C. Cir. 2000). Additionally, plaintiffs may not create a genuine issue of fact by placing conclusory allegations or statements of inference, conjecture, speculation, or suspicion in their declarations. S*ee Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888 (1990).

**B.     The Motion To Dismiss Standard**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)((6) tests only whether a complaint properly states a claim. Fed. R. Civ. P. 12(b)((6); *Freeman v. Fairchild*, 254 F. Supp. 52, 59 (D.D.C. 2003).  In deciding a motion pursuant to Rule 12(b)(6), the court must accept all the complaint's well-pled factual allegations and draw all reasonable inferences in the non-movant's favor.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974, *overruled on other grounds by*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).   However, the court need not accept as true legal conclusions that have been cast as factual assertions.  *Kowal v. MCI Communications*, 305 U.S. App. D.C. 650, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  As discussed below, application of that standard as provided for by Supreme Court and D.C. Circuit precedent provides for the district court to conduct a thorough scrutiny of the complaint before permitting the matter to proceed.

**1.     Legal Conclusions Cast As Allegations Of Fact Are Insufficient**

"Despite Federal Rule of Civil Procedure 8's simplified notice pleading standard, 'the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by facts in the complaint." *Mountain States Legal Found'n v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002). "Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*   The D.C. Circuit has repeatedly affirmed decisions of this Court dismissing complaints because plaintiffs had relied upon assertions of legal conclusions and factually unsupported inferences, instead of allegations of fact, which, if proven, would satisfy the elements of their claims. *See,*

*e.g., id.*; *Western Associate Ltd. Partnership. v. Market Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001); *Kowal v. MCI Communications*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### 2.      Contradictory Allegations Justify Dismissal

Further, the Court of Appeals has held that "dismissal is appropriate where the complaint's allegations contradict the claim asserted." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In deciding a Rule 12(b)(6) motion, the court is to consider the effect of the complaint's allegations upon the plaintiff's claims against the various defendants. *Id.*  In *Browning*, an author-plaintiff alleged that she attempted to sell her book subsequent to – and, therefore, despite -- having been threatened by one defendant.  The D.C. Circuit held that that allegation by plaintiff contradicted her claim that that defendant's actions tortiuosly interfered with the plaintiff's business opportunity to publish her novel.  292 F.3d 242-244.  The Court affirmed the district court's dismissal of that claim pursuant to Rule 12(b)(6) against that defendant upon that basis, although the claim survived as to two other defendants. In this case it is undisputed that plaintiffs were provided an Approval for their January 24, 2009 demonstration that authotized them to express themselves over a 12-hoour period, in the location of their choosing, in myriad ways.  Further, to the extent that the earlier-submitted declarations of Rev. Mahoney and/or K.C.. Martinez failed to establish facts to support, in particular, their RFRA claims, the Court may rely on them to grant Defendants judgment as a matter of law.

### 3.      The Court May Look Beyond The Complaint To Dismiss The Complaint

In addition, the Court may "look beyond the complaint to the record" in determining whether the complaint adequately alleges facts to survive a Rule 12(b)(6) motion. *Western Associates*, 235 F.3d at 634 (D.C. Cir. 2001) (citing *Phillips v. Bureau of Prisons*, 192 U.S. App. D.C. 357, 192 F. 2d 966, 969 (D.C. Cir. 1979); 5A Charles Alan Wright and Arthur R. Miller,

Federal Practice and Procedure § 1357 (2d Ed. 1990)).  In *Western Associates*, the Court of

Appeals stated that the district court had correctly considered the plaintiff's earlier complaint in

determining that the plaintiff's amended complaint merely dressed up the old [complaint] with

boilerplate RICO verbiage," and that plaintiff appeared to have distorted the allegations against

the defendant.  235 F.3d at 644.  The Court of Appeals affirmed the district court's dismissal of

the complaint pursuant to Rule 12(b)(6) upon that basis.  In this case, much of the verbiage of the

AVC has merely dressed up plaintiffs' earlier complaint.

### 4.      Rule 12(b)(6) Requires Thorough Scrutiny Of The Complaint

To determine whether a complaint alleges facts sufficient to survive a Rule 12(b)(6)

motion, the court must scrutinize the allegations to determine whether they assert facts to be

proved, rather than legal conclusions couched as factual allegations.  *See Papasan v. Allain,* 478

U.S. 265 (1986).  In *Papasan,* the Supreme Court conducted such an analysis regarding "[t]he

petitioners' allegation that, by reason of the funding disparities relating to the Sixteenth Section

lands, they have been deprived of a minimally adequate education is just such an allegation

[constituting a legal conclusion couched as a factual allegation]."  478 U.S. at 286.

The Supreme Court explained that the petitioners had failed to allege that schoolchildren

in the affected countries were not taught to read or write.  *Id*.  Also, the petitioners had not

alleged that they had not received instruction upon even the educational basics.  *Id*.  Accordingly,

petitioners had "allege[d] no actual facts in support of their assertion that they had been deprived

of a minimally adequate education."  *Id.*  Upon that examination of the petitioners' allegations,

the Supreme Court held that "[w]e are not bound to credit and may disregard the allegation," as

the Court, in fact, did.  *Id*.

In *Mountain States*, the D.C. Circuit analyzed the appellant/plaintiff's complaint in the manner that the Supreme Court had examined the *Papasan* complaint.  306 F. 3d 1136-37. Plaintiff, Mountain States, asserted that President Clinton had engaged in judicially reviewable, *ultra vires* conduct, by issuing six Presidential Proclamations designating a number of national monuments.  *Id*. at 1133.  The Circuit reviewed the complaint to find that "Mountain States alleges in its complaint merely that the six Proclamations at issue exceed the President's authority under the Property Clause and are therefore unconstitutional and *ultra vires*. Complaint ¶¶ 84-104."  *Id*. at 1136-37.

The Court of Appeals held that Mountain States had failed to allege any facts sufficient to support its claim of *ultra vires* conduct.  *Id*.  Additionally, Mountain States' arguments "contain[ed] only the bald assertion that the President acted outside the bounds of his constitutional authority."  *Id*. at 1134.  Applying *Papasan* to reject Mountain States' legal conclusions couched as factual allegations, the Court upheld the District Court's dismissal of the complaint based upon the complaint's failure to have alleged facts to support the plaintiffs' claims.  *Id*. (citing Fed. R. Civ. P. 8(a); *Papasan*, 478 U.S. at 286; *Browning*, 292 F.3d 235).

Here, the AVC avers that plaintiffs have been denied equal protection in the application of D.C. Code § 22-3312.01, but does not allege any facts to support this conclusion.

## II.   D.C. Code § 22-3312.01 Is Constitutional On Its Face And As Applied To Plaintiff's Actions

Plaintiffs contend that D.C. Code § 22-3312.01 "is a classic prior restraint on speech." AVC ¶ 160.  Although they acknowledge that 24 DCMR § 706.9 provides grounds on which the MPD may deny Approval of Assembly Plans, AVC ¶ 161, they contend that MPD "ignores the existence and express strictures" of § 706.9, AVC ¶ 162.  Plaintiffs argue that in allegedly failing

to apply the discretion limitations of § 706.9 in issuing Approvals, that MPD exercises unbridled discretion to deny Approvals, which renders § 3312.01 unconstitutional.

Plaintiffs misconstrue the interplay of local laws that govern the Approval process.  First, the Approval process is not governed by § 22-3312.01; it is governed by the 2004 Act.  Second, the Approval does not restrict the content of their expression in any way; it simply imposes a reasonable manner restriction on how that expression may be communicated informed by a particularly appropriate place restriction.  Third, to the extent that § 22-3312.01 would otherwise be unconstitutional, this Court should adopt a construction, if it is possible to do so, which saves the statute from unconstitutionality, rather than one which results in its destruction.

### A.  The Approval Process Is A Constitutionally Valid, Content-Neutral, Reasonable Time, Place, And Manner Restriction Process

"The First Amendment does not guarantee the right to communicate ones views at all times and places, or in any manner that may be desired."  *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981).  Pertinent in this context, the First Amendment does not "confer upon a speaker the freedom to paint a message on [][public property], or to readorn with graffiti property owned by the government or another person."  *People for the Ethical Treatment of Animals v. Giuliani,* 105 F. Supp.2d 294, 318 (S.D.N.Y. 2000).

The D.C. Circuit has recognized the government's authority to regulate expressive conduct immediately adjacent to the White House.  *See White House Vigil for the ERA v. Clark,* 746 F.2d 1518 (D.C. Cir. 1984) (upholding prohibition on display of signs and placards within the "center zone" of sidewalk outside White House).  The U.S. Supreme Court has held that "[a]t some point, the government's relationship to things under its dominion and control is virtually identical to a private owner's property interest in the same kinds of things, and in such circumstances, the

State, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 815 (1984) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). In *Metromedia Inc. v. City of San Diego*, the Supreme Court upheld a municipal prohibition of billboards to prevent visual clutter. 453 U.S. 490 (1981). Thus the authority of the State to reasonably restrict expression, even in public space, is well-established.

In *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293-94 (1983), the Supreme Court reiterated the test of a restriction that impacts speech in a traditional public forum:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Id.* at 293-294 (citations omitted). The three-part test in *Clark* has been widely used and reaffirmed by later decisions of the Supreme Court. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

Importantly, in this case, MPD's application of the statutes and rules governing the Approval process yielded an Approval that did not completely ban plaintiffs' expression.

### 1.      The Restrictions Are Content Neutral.

The Approval allows Plaintiffs to communicate their message when and where they want and by any number of non-destructive means they may chose, entirely without regard to its contents. *See* Approval, a copy of which was submitted as TRO Ex. 6.  Thus, the limitations are content neutral and did not impose "a total prohibition" on Plaintiffs' speech.  Plaintiffs seek to persuade the Court that the Approval's prohibition of chalk usage is content-based, even though

they conceded that "[t]o be sure, chalking is a form of speech that *may* be reasonably restricted." TRO Mot. at 14. (emphasis in original). Plaintiffs do not identify any belief that the Approval precludes them from expressing. *See* AVC, *generally*; *see also* Declaration of Reverend Mahoney filed in support of TRO Motion (Rev. Mahoney Decl.) Doc. 4-6; Declaration of K.C. Mahoney (now K.C. Martinez) filed in support of TRO Motion (Martinez Decl.) Doc. 4-5.

Further, as reflected by the November 24, 2008 letter, TRO Ex. 1, and the Rev. Mahoney and Martinez Declarations, that Plaintiffs intended to and expressed to MPD their desire to engage in forms of expression, including prayer vigils, other than chalking in their demonstration. Nothing in the Approval inhibited those other activities and expressions in any way, reflective of the fact that the Approval's single limitation on Plaintiffs' proposed activities is content-neutral. Accordingly, because the Approval's restrictions were not imposed based on the content of the speech, those restrictions are not subject to strict scrutiny. Rather, an intermediate level of scrutiny is applicable. *See, e.g., Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642 (1994); *American Library Ass'n v. Reno,* 33 F.3d 78, 84 (D.C. Cir. 1994), *cert. denied,* 515 U.S. 1158 (1995).

> **2. The Restrictions Are Narrowly Tailored To Serve A significant Government Interest**

> **a. The District's Interest at Stake is Significant.**

The second prong of the Supreme Court's test in *Clark* asks whether the restriction is "narrowly tailored to serve a significant government interest." *Id.*, 468 U.S. at 293-94. The government's interest in preserving the aesthetics and safety of the paved part of Pennsylvania Avenue around the White House is undeniable.

The Supreme Court described the area in front of the White House as "unique resources that the Federal Government holds in trust for the American people" and Lafayette Park across

from the White House as a "garden park with formal landscaping of flowers and trees, with fountains, walks and benches." *Clark,* 468 U.S. at 290. In *Taxpayers for Vincent,* the Supreme Court held that "[i]t is well settled that the state may legitimately exercise its police powers to advance aesthetic values. The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary." 466 U.S. at 805. In *White House Vigil for the ERA v. Clark,* 746 F.2d 1518 (D.C. Cir. 1984), the Court of Appeals for this Circuit upheld a restriction prohibiting the display of signs and placards within the "center zone" of the sidewalk outside the White House, finding that the Park Service regulation was justified in part to preserve, unimpaired, the public's view of the White House from Pennsylvania Avenue and Lafayette Park. The Court of Appeals noted that it was "well established that government's power to regulate private affairs encompasses the power to promote aesthetic goals." *Id.*, 746 F.2d at 1534.

Additionally, the government's interest in keeping this area free of the visual clutter caused by "chalk art" and the ensuing damage that clean up of "chalk art" requires must be measured not just against plaintiffs' planned demonstration but the effect of other groups who could demand permission to engage in similar "chalk art" activities. *Clark,* 468 U.S. at 297 (citing *Heffron*, 452 U.S. at 652-53). Given the high profile nature of the venue, and the number of historic protests that have occurred here, once permission for one type of demonstration is given it may safely be assumed that more such requests will be made.

The significance of the government's legitimate interests in not having this premier location on Pennsylvania Avenue defaced with "chalk art" has been well-established before Plaintiffs filed their AVC. The Supreme Court has observed the importance of this area as a garden held in trust for all Americans, *Clark*, 468 U.S. at 290; as such the government may

reasonably restrict its use by demonstrators and non-demonstrators alike, to preserve value to all, *see Clark* at 297 (upholding Park Service regulation prohibiting camping in Lafayette Park).[1]

Not only would such chalk art interfere with the aesthetics of the location, but it is also is damaging to the street. The clean-up efforts required, as described by Ms. Smith, actually cause damage to the new pavement installed in 2004, and present the potential of safety issues for pedestrians using this street.  (Declaration of Ann Bowman Smith (Smith Decl.) Doc. 8-7).

### b.  The Restriction is Narrowly Tailored to Serve The Significant Government Interest

A restriction is "narrowly tailored" to serve substantial government interests if it "target[s] and [eliminates] no more than the exact source of the 'evil' [it seeks] to remedy." *Taxpayers for Vincent,* 466 U.S. at 808-10. Here, plaintiffs make no claim that the restriction against their "chalk art" is not narrowly tailored. Indeed, plaintiffs concede that "chalking is a form of speech that *may* reasonably be restricted." Plaintiffs' Mem. at 14 (emphasis in original).

There can be no question that D.C.'s restriction, reflected by the Approval's prohibition against defacing the roadway, is narrowly tailored to the problem "chalk art" presents, which is that it defaces a public street.  Plaintiffs have only been restricted from "chalk art" activities in

---

[1]      "Pennsylvania Avenue in front of the White House" underwent an aesthetic redesign by the Federal Government in 2003 to transform it "to a beautiful civic area befitting one of the nation's most prominent and visited locations," including a "beautiful civic space worthy of America's "Main Street.'" Doc. 8-7 at ¶ 3.
    Ms. Smith's declaration also speaks to the foreseeable damage that would result to the "rustic" road surface of Pennsylvania Avenue from the power washing necessary to clean it following defacement by chalk.  Plaintiffs "believe" that two hours after Rev. Mahoney had been stopped by police in his unlawful defacement of Pennsylvania Avenue on January 24, 2009, Rev. Mahoney's brother, Terrence, returned to the area where Rev. Mahoney had drawn the letter "P." AVC ¶¶ 142, 141, 131-32.  Upon his return to that location, Terrence Mahoney observed no evidence of the chalking or damage to the roadway.  AVC ¶¶ 143-44.  That a single chalk letter may have been removed without damage perceptible to a layperson does not call into question the government's significant interest in protecting Pennsylvania Avenue in front of the White House from damage to be caused by the numerous large scale chalk and other defacements requiring power washing were MPD's Approval process to be held unconstitutional.

connection with the demonstration they will have. No other free speech activities have been restricted. As such, the restriction comfortably qualifies as "narrowly tailored."

### 3. The Approval Allowed Ample Alternative Means Of Communication

The third *Clark* prong asks whether the restriction at issue leaves open ample alternative channels for communication. Plaintiffs seek to portray the January 24, 2009 Approval's prohibition on chalk usage as denying them their demonstration altogether. However, the Approvals did nothing to limit Plaintiffs' prayer vigils or other expressive acts they may have chosen to engage in other than chalking up Pennsylvania Avenue.

On the contrary, the Approval allowed for plaintiffs to demonstrate in the area they requested, for a 12-hour period running from sun-up to sundown. TRO Ex. 6. It allowed for plaintiffs and their fellow demonstrators, numbering up to 5,000 persons, to carry banners, protest, march, conduct prayer vigils, and other expressive activities. (*Id.*). Clearly, the application of D.C. Code § 5-31.01, *et seq.*, in combination with D.C. Code § 3312.01 and DCMR § 706.9, provided plaintiffs on January 24, 2009 a myriad of other avenues to deliver their messages in the very same location and at the very same time they wanted to. Accordingly, Defendants should be granted judgment as a matter of law on the First Cause Of Action.

### B. Neither D.C. Code § 22-3312.01 Nor The Approval Process Of Which It Is Part Are Facially Invalid.

Plaintiffs assert in Count I, that § 22-3312.01 vests District officials with "unbridled discretion to deny permission to individuals wishing to engage in certain speech activities." AVC ¶ 164. On this basis plaintiffs are understood to argue that D.C. Code § 22-3312.01 and/or the Approval process of which it is part are prior restraints on speech and are facially invalid. Their argument is defeated by Supreme Court precedent.

The Supreme Court has observed that "the regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny the use of a forum in advance of actual expression.'" *Rock Against Racism,* 491 U.S. 781, 781 n.5 (1989) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975)).  D.C. Code § 22-3312.01 does not give public officials the power to deny the use of a forum; it simply prohibits the defacement of a forum unless the proprietor of the forum consents to the defacement.

The Supreme Court has explained that the facial challenge doctrine is an extraordinarily narrow doctrine that applies only to only to a narrow class of cases in which the law at issue has "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks."  *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988).  The doctrine does not permit speakers to "challenge as censorship any law involving discretion to which [they may be] subject."  *Id.*  "Laws of general application," such as D.C. Code § 22-3312.01, "provide too blunt a censorship instrument to warrant judicial intervention" through a facial challenge.  *Id.*

Nevertheless, plaintiffs are understood to contend that under the reasoning of *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), § 22-3312.01 is facially invalid "[b]ecause there is nothing in D.C. Code § 22-3312.01 to prevent government officials from arbitrarily applying the provision based on the content of speech."  Plaintiffs' Statement Of Points And Authorities Supporting The Motion For Temporary Restraining Order And Preliminary Injunction (Doc. 4-3) at 9-10.  Plaintiffs misread *Forsyth County.*

### 1.      *Forsyth County*

In *Forsyth County*, the Supreme Court upheld the facial invalidation of a county ordinance that allowed the county to establish the level of a permit fee for any given

demonstration or use of public, or to waive the fee entirely, at the whim of the government administrator charged with issuing such permits. 505 U.S. at 133. The Court explained that "[i]n evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it." 505 U.S. at 131 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 795-796 (1989); *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, n. 11(1988); *Gooding v. Wilson,* 405 U.S. 518, 524-528 (1972)). In *Forsyth County*, "[b]ased on the county's implementation and construction of the ordinance, it simply cannot be said that there [were] any 'narrowly drawn, reasonable and definite standards,' guiding the hand of the Forsyth County administrator." 505 U.S. at 132-33 (quoting *Niemotko v. Maryland,* 340 U.S. 268, 271 (1951).[2]

### 2. The District's Permitting Framework Is Facially Content-Neutral

The District's authorization of public space for purposes of demonstrations is governed by D.C. Code § 5-331.01, *et seq.* ("2004 Act"). The District's policy regarding the facilitation of demonstrations and other free speech activities is expressly set forth in § 5-331.01, which provides:

> It is the declared public policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia, and to engage in First Amendment assembly near the object of their

---

[2]   The Court described the discretion ascribed to that administrator as follows:

> The decision how much to charge for police protection or administrative time-or even whether to charge at all-is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees.

*Id.*

protest so they may be seen and heard, *subject to reasonable restrictions designed to protect* public safety, persons, and *property, and to accommodate the interest of persons not participating in the assemblies to* use the streets, sidewalks, and other public ways to travel to their intended destinations, and *use the parks for recreational purposes.*

The MPD's discretion in applying reasonable restrictions is governed by § 5-331.04, "Reasonable time, place, and manner restrictions on First Amendment assemblies," which in turn, provides in pertinent parts as follows:

> No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities.

§ 5-331.04(c). Accordingly, the 2004 Act, which governed MPD's decisionmaking in issuing the Approval for Plaintiffs' demonstration, imposes a clear and absolute prohibition against any consideration of the content of beliefs to be expressed by persons submitting notifications to MPD. Thus, the District's statutorily-mandated Approval process requires that § 22-3312.01 be applied on a content-neutral basis to Assembly Plans.

> **3.     Were § 22-3312.01 Subject To Facial Challenge, It Would Be Proper For This Court To Adopt A Construction Of This Statute Which Will Save It From Unconstitutionality, Rather Than One Which Will Result In Its Destruction**

In evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered. *See Forstyh County,* 505 U.S. at 131; *Rock Against Racism,* 491 U.S. at 795-796; *Lakewoo,* 486 U.S. ay 770, n. 11(1988); *Gooding,* 405 U.S. at 524-528; *see also*, *Nicholson v. United States*, 97 Daily Wash. L. Rptr. (June 19, 1969), appended to *Dellums v. Powell* 566 F.2d 167 (D.C. Cir. 1977). "[I]n view of the paramount rule of statutory construction that it is the duty of the Court to adopt a construction, if it is possible to do so, which will save the statute from unconstitutionality, rather than one which

would result in its destruction. *Nicholson* at 16 (citing *Lynch v. Overholser*, 369 U.S. 705 (1962); *Rescue Army v. Municipal Court*, 331 U.S. 549, 568-575 (1947); *Ashwander v. T.V.A.*, 297 U.S. 288, 345, 56 (1936); *Greene v. McElroy*, 360 U.S. 474 (1959); *United States v. Harriss*, 347 U.S. 612, 618 (1954); *Screws v. United States*, 325 U.S. 91, 100 (1945); *Schneider v. Smith*, 390 U.S. 17, 88 (1968); *Bolton v. Harris*, 395 F.2d 642 (D.C.Cir.1968)).

In *Nicholson*, the Court further concluded that a statute restricting demonstrations on the steps of the U.S. Capitol could only "be saved from total invalidity only if it is interpreted narrowly, consistently with its original purposes." *Nicholson* at 16.  On that basis, the Court determined that the scope of the statute, based on legislative and other materials, should be restricted to permit prosecution only for conduct which interferes with the orderly processes of the Congress, or with the safety of persons, or their right to be free from intimidation, or harassment. *Nicholson*, at 17.  Here, we look to the purpose and content-neutrality of § 22-3312.01 and the strictures of the 2004 Act, on which basis § 22-3312,01 is to be saved.

In this matter, Plaintiffs point out that they have on at least two occasions "chalked" public property in the presence of MPD personnel.  AVC ¶ 56.  In those instances, the content of the Plaintiffs' expressions were consistent with the content of markings they intend to make on Pennsylvania Avenue.  This record reflects that the District has not withheld its consent from would-be "chalkers" on the basis of content, and certainly not on the basis of constitutionally protected content.  Accordingly, based on this history, this Court may interpret **§** 22-3312.01 to be restricted to permit the imposition of criminal sanctions for the defacing of public property only where consent is withheld on a content-neutral basis consistent with the full protections of the First Amendment.

Further, that §22-3312.01 provides for many ample alternative means of expression – not censorship – determines that it is not facially unconstitutional.  For these reasons Defendants should be granted judgment as a matter of law on the First Cause of Action.[3]

## III.   D.C. Code § 22-3312.01 And the Approval Process Do Not Violate Free Exercise

Plaintiffs further contend that the Approval, § 22-3312.01, and the Approval process violate their First Amendment Free Exercise rights.  Second Cause of Action, AVC ¶¶ 165-72. This claim should be dismissed for the same reasons plaintiffs' First Cause Of Acton should be dismissed.

The constitutionality of a neutral legal requirement of general applicability, such as § 22-3312.01 and the Act, is determined by the fact that it is rationally related to a legitimate governmental interest.  *See, e.g., Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990); *Goldman v. Weinberger*,  475 U.S. 503 (1986).  Laws that impact religious exercise only as an "incidental effect," which would be the most plaintiff-favorable possible analysis of § 22-3312.01 and the Act, are "subject to no free-exercise scrutiny at all."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 502, 562 (1993) (Scalia, J., concurring) (quoting *Smith*, 494 U..S. at 878.) As demonstrated above, § 22-3312.01 and the Act easily satisfy

---

[3]     To the extent that plaintiffs argue that the District's Approval process is unconstitutional or that the prohibition within the January 24, 2009 Approval violated their rights because 24 DCMR 706.9 does not explicitly state that Approvals may be restricted or denied where Assembly Plans reflect that the intended assemblies will violate facially neutral criminal laws of general application, their argument is ill-taken.  That a regulation omits a requirement that local statutory law be followed does not render the statutory law unenforceable.  Further, the discretion-limiting requirements of an assembly approval process need not anticipate every possible contingency.  Rather, such restrictions need only be narrowly drawn, reasonable and definite standards" that do not leave the decision "to the whim of the administrator."  *Thomas,* 534 U.S. at 324.  It would certainly be ironic – if not wholly illogical - if the District, which has a statute protecting against defacement of property, subject to property owners' exceptions, could be condemned for not authorizing defacement of the Pennsylvania Avenue in front of the White House, even though the District could regulate chalk art in the absence of a statute.

the "rationally related" test on their face and as applied.  Accordingly, Defendants should be granted

judgment as a matter of law on plaintiffs' Third Cause Of Action.

IV.     **The Approval Does Not Offend Plaintiffs' RFRA Rights And Defendants Should Be Granted Judgment As A Matter Of Law On The Third Cause Of Action**

The Religious Freedom Restoration Act (RFRA) provides that the government shall not

"substantially burden" a person's exercise of religion unless the burden furthers a compelling

government interest and is the least restrictive means for furthering that interest. 42 U.S.C. §

2000bb-1(b); *Gonzales v. O'Centro Espirita Beneficente Uniao do Vegetal,* 126 S. Ct. 1211,

1216 (2006). This statute was enacted in response to the Supreme Court's decision in

*Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 886 (1990) (Smith), in

which the Court had held that generally applicable laws of neutral intent are no longer subject to

challenge under the First Amendment's Free Exercise Clause, even if they incidentally burden

the practice of religion. *Gonzales,* 126 S. Ct. at 1216-17. Congress characterized *Smith* as having

"virtually eliminated the requirement that the government justify burdens on religious exercise

imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a) (4) . RFRA creates a statutory

right requiring the government to satisfy the compelling interest test set forth in *Sherbert v.*

*Verner,* 374 U.S. 398 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205 (1972), when a government

action substantially burdens the free exercise of religion. 42 U.S.C. § 2000bb(b) (1). Thus, a

violation of RFRA requires the same elements that a pre-*Smith* Free Exercise violation generally

required. *Compare  Sherbert v. Verner,* 374 U.S. at 406 *with* 42 U.S.C.§ 2000bb(b) (1); *see*

*Gonzales,* 126 S. Ct. at 1220.

RFRA employs an explicit burden-shifting mechanism. *See Gonzales,* 126 S. Ct. at 1219;

*Branch Ministries v. Rissotti,* 211 F.3d 137, 142, 144 (D.C. Cir. 2000).  A RFRA claimant must

first demonstrate a sincerely held religious belief, and then he must demonstrate that the

challenged government action has created a "substantial burden" on that belief. *Thiry v. Carlson,* 78 F.3d 1491, 1494 (10th Cir.), *cert. denied,* 519 U.S. 821 (1996). Only when the plaintiff succeeds on these two points does the burden shift to the defendant to show that the challenged rule furthers a compelling government interest and is the least restrictive means of furthering that interest. *Id.*

Defendants assume for the purposes of this motion that plaintiffs have a deep and sincerely held belief that they must communicate their religious beliefs relating to abortion and "to prayerfully challenge President Obama on his radical support for abortion in Washington, D.C. this January."  Complaint ¶ 53; *see also* AVC ¶¶ 33, 40, 51, 55, 58-60.  Plaintiffs, however, advance no claim that their religious beliefs require them to communicate using chalk art, especially on Pennsylvania Avenue in front of the White House.  *See* AVC ¶¶ 33, 40, 51, 55, 58-60; *see also* Rev. Mahoney Decl at 22-25, 32, 34-40, 60, 61; K.C. Martinez Decl. at 11, 12, 16, 17, 19-25, 34. Thus, Plaintiffs cannot show that being denied the ability to make chalk images on the roadway of Pennsylvania Avenue in front of the White House creates a substantial burden on any religious practices.

Rather, the record demonstrates that chalking the Pennsylvania Avenue roadway is not required by a deep and sincerely held belief.  It is simply a preference.

The Complaint and Plaintiffs' declarations reflect that chalking Pennsylvania Avenue is just one of a number of "activities and strategies under the name, the Birmingham Letter Project" planned and organized by Plaintiffs "in anticipation of the inauguration and presidency of Barack Obama."  Complaint ¶ 34; Rev. Mahoney Decl. ¶¶ 23-25; K.C. Martinez Decl. ¶¶ 11-13.  Other suitable means of communicating their concerns chosen by Plaintiffs include "an internet website

describing [plaintiffs'] interests, [their] views, and [their] methods.  Complaint ¶¶ 36-37; Rev.

Mahoney Decl. ¶¶ 23-24; K.C. Mahoney Decl. ¶¶ 11-12.

"It is not the case that every activity which could be cast as 'religiously motivated' is the

kind of exercise of religion protected by RFRA. *Henderson v. Kennedy,* 253 F.3d 12, 16-17

(D.C.Cir.2001)."  *Mahoney v. U.S. Marshals Service,* 454 F. Supp.2d 21, 38 (D.D.C. 2006)

("Red Mass case").  Plaintiffs' own description of their thought process behind their choice to

seek to use chalk art as one of their "activities and strategies" indicates that choice is not subject

to RFRA's protections:

> January 22" is the anniversary date of the Supreme Court's decision in Roe v.
> Wade.  Each year on that date, thousands and thousands of Americans travel to
> Washington, or to their state Capitols, to memorialize the lives lost to legalized
> abortion and to express continued opposition to the civil rights wrong that
> legalized abortion inflicts on prenatal children.  As a consequence, many like-
> minded individuals will be in the metropolitan Washington, DC area for the
> commemorations on January 22, 2009.  With that in mind, Plaintiffs decided to
> organize and conduct their chalk art demonstration on Saturday, January 24, 2009.

Complaint ¶¶ 46-49; Rev Mahoney Decl. ¶¶ 34-37; K.C. Martinez Decl. ¶¶ 19-22.  *Cf.  Mahoney*

*v. U.S. Marshals Service,* 454 F. Supp.2d 21,38 (D.D.C. 2006) ("Red Mass case").

In assessing the claims of Reverend Mahoney, another individual and the CDC in that

case, Judge Lamberth observed that instead of demonstrating that that their actions were RFRA-

protected, facts materially similar in to those in this case indicated that

> their evidence confirms the notion that plaintiffs wish to demonstrate at the
> Red Mass because it provides a target-rich audience of prominent government
> officials, at whom plaintiffs wish to direct their political message. This is a classic
> case of speech on an issue of public interest, not a case of religious exercise.
> Finally, even if the Court were to assume that plaintiffs were exercising their
> religion by demonstrating in front of the Mass, there would still be no substantial
> burden on this exercise, for the same reasons the Court has held that the time,
> place, and manner restrictions in this case were reasonable.

*Id.*

Here Plaintiffs have chosen a course that is well-calculated to communicate their

views to a target-rich audience of like-minded persons.  Complaint ¶¶ 58-59, 112

("Plaintiffs announced the planned demonstration and invited participants"); Rev

Mahoney Decl. ¶¶ 36-37, 61 (same as Complaint ¶ 112); K.C. Martinez Decl. ¶¶ 21-22;

35(same as Complaint ¶ 71).  These facts speak to this case being a classic case of speech

on a public interest, not a case of religious exercise.  *Red Mass* case at 38.  Accordingly,

Plaintiffs do not enjoy a substantial likelihood of success of their RFRA claims.[4]

Although the Supreme Court has admonished that it is not for the courts to decide what

constitutes a religious belief or practice based on the Court's perception of the belief or practice

at issue, *see Thomas v. Review Bd. of Indiana Employment Section,* 450 U.S. 707, 714 (1981),

plaintiffs nevertheless have the burden of demonstrating that a religious belief or practice was at

issue. This, however, they failed to do.

Nonetheless, even if plaintiffs' Amended Complaint could be read to state that a sincerely

held religious belief or practice was implicated, plaintiffs still would have had to demonstrate

that the challenged government action created a "substantial burden" on that belief. *Branch*

*Ministries, Inc. v. Rossotti,* 211 F.3d at 142; *Thiry v. Carlson,* 78 F.3d at 1494.

RFRA does not define what constitutes a "substantial" burden. Yet not all burdens on

religion can be considered "substantial." 42 U.S.C. § 2000bb(b); *Werner v. McCotter,* 49 F.3d

1476, 1480 (10th Cir.), *cert. denied,* 515 U.S. 1166 (1995) (not all regulation of religious activity

or expression requires showing of compelling state interest); 139 Cong. Rec. S14352 (Daily Ed.

Oct. 26, 1993) ("[The Act] does not require the Government to justify every action that has some

---

[4]      Because the Christian Defense Coalition, is an "unincorporated religious association,"
which is an entity that is not a "person" under RFRA, it does not have rights under RFRA. 42
U.S.C. § 2000bb-1(a); *Red Mass* Case at 38, fn. 7.  Accordingly, CDC's claim should be
dismissed as a matter of law at this point, and it does not present any likelihood of success on the
merits of the RFRA claim.  *Id.*

effect on religious exercise. Only action that places a substantial burden . . . must meet the compelling State interest [test].").

Thus, by its very terms, RFRA does not guarantee the religious adherent the ideal, or the most convenient, circumstance in which to practice each and every aspect of his religion. Whether a claimed burden is substantial must be viewed in the context in which it is made. As the Supreme Court stated in *Procunier v. Martinez,* 416 U.S. 396, 409-10 (1974), "First Amendment guarantees must be 'applied in light of the special characteristics of the . . . environment.'" *Goldman v. Weinberger,* 475 U.S. 503, 506-07 (1986).

In *Branch Ministries, Inc. v. Rossotti,* this Court noted that the imposition of a substantial burden relates to the observation of a central religious belief and whether the adherent has been pressured to modify his behavior and violate his beliefs. *Id.*

Applying the "substantial burden" test here, plaintiffs cannot demonstrate a substantial burden on the free exercise of their religious rights.  The Approval provides Plaintiffs the opportunity to spread their messages through a variety of manners, where and when they want to. As discussed above, it is well established that a would-be demonstrator does *not* have the right to demand the desired location of communication. Here, Plaintiffs were not entitled to mark in chalk on the porous and rustic pavement of Pennsylvania venue in front of the White House because of the damage it would to that historic site and the adverse impact allowing such expression would have on the abilities of the District, and the federal government, to protect public space from becoming marred throughout this city.

Because plaintiffs cannot demonstrate a substantial burden on the free exercise of their religion, this Court need not address whether the government had demonstrated a compelling interest in imposing the burden and whether it did so in the least restrictive means. Nonetheless, should this Court desire to address the issue, the Smith and Crane declarations earlier submitted

in opposition to the TRO Motion amply establish that the government has a compelling interest in ensuring preserving this area and the city more generally.

Moreover, those engaged in First Amendment activities with religious messages are certainly not entitled to an outcome that those without religious messages could not achieve. *Accord ISKCON v. Kennedy,* 61 F.3d at 958 (under the First Amendment, religious organizations have no greater rights than other organizations regarding disseminating messages on federal property).

The foregoing makes clear that plaintiffs' desire to communicate by chalking up Pennsylvania Avenue is not a religious practice, and that prohibiting them from doing so while allowing other means of communicating at the desired time and place does not substantially burden their free exercise of religion.  Further even if it if the Approval imposed any burden on plaintiffs' free exercise of religion it did not impose a substantial burden. Accordingly, Defendants should be granted judgment as a matter of law on the Third Cause Of Action.

**V.    MPD's Actions And D.C. Code § 22-3312.01 Do Not Violate Rights Guaranteed By The First Amendment Or The 2004 Act**

Plaintiffs contend in their Fourth Cause Of Action that they have suffered violations of their rights under the First Amendment and the 2004 Act, based on their mistaken premise that § 22-3312.01 is not applied and is not required to be applied in a content-neutral manner.  AVC ¶¶179-182.  As explained *supra*, at 25, the 2004 Act governs MPD's application of § 22-3312.01 for purposes of approving demonstration plans.  The 2004 Act requires MPD to facilitate demonstrations and other free speech activities and to apply reasonable time, place, and manner restrictions in a content-neutral manner.  *See* §§ 5-331,01, 5-331.04(c).  Accordingly, Defendants should be granted judgment as a matter of law on the Fourth Cause Of Action.

## VI.   D.C. Code § 22-3312.01 And The Approval Process Within Which It Has Been Applied To Not Deny Plaintiffs Equal Protection

Plaintiffs predicate their Fifth Cause of Action on the three premises, that:

- "They are similarly situated to others in the District of Columbia that have been permitted to use chalk to create messages and images on public property, or even encouraged to do so;"

- "There existed no constitutionally sufficient justification for the Defendants to treat plaintiffs differently than others that have sought to communicate by making chalk images and messages on the District's streets and sidewalks;" and

- "By their actions the Defendants deprived the plaintiffs of their right to equal protection, guaranteed to them by the Due Process Clause of the Fifth Amendment of the United States Constitution."

AVC ¶¶ 183-85.

From these allegations Defendants understand that plaintiffs contend that D.C. Code § 22-3312.01, the 2004Act and/or the Approval process, generally, have been applied differently and detrimentally to them as compared to "similarly situated others," denying them equal protection of law. Defendants should be granted judgment as a matter of law on this claim.

Although the Fifth Amendment contains no "equal protection" clause as such, "it is well settled that the Fifth Amendment's Due Process Clause encompasses equal protection principles." *Matthews v. De Castro*, 429 U.S. 181, 182 n.1 (1976) (citing *Weinberger v. Salfi*, 422 U.S. 749, 768-770 (1975). On its face, the AVC makes plain that plaintiffs are not similarly situated with anyone. (*See* AVC ¶¶ 61-80; 90). The allegations of the AVC reflect that the District has permitted or encouraged the use of chalk to mark sidewalks of road surfaces other than the sidewalks and roadway of the 1600 block of Pennsylvania Avenue. (*Id.*) Plaintiffs do not allege that anyone has ever been granted an Approval by the District to apply chalk to the sidewalks or roadway in front of the White House. (*See* AVC, generally.). Thus, they allege no facts, which if proven, would satisfy the elements of their claim. *See, e.g., id.*; *Western Associate*

*Ltd. Partnership. v. Market Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001); *Kowal v. MCI Communications*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).[5]

Moreover, MPD has not issued any Approvals authorizing anyone to to mark Pennsylvania Avenue in front of the White House, or the adjoining sidewalks, with chalk or any other substance.   DSOF ¶ 9.   Accordingly, Defendants should be granted judgment as a matter of law on plaintiffs' Fifth Cause of Action.

## VII.   The Sixth Cause Of Action Should Be Dismissed As A Matter Of Law

In the Sixth Cause Of Action, Rev. Mahoney sues an unidentified "John Doe" MPD officer in his official capacity.   Rev. Mahoney claims that Officer Doe violated his rights under the First, Fourth, and Fifth Amendments, as well as RFRA, by interfering with Rev. Mahoney's defacement of Pennsylvania Avenue, detaining at that location, coercing Rev. Mahoney to identify himself, and seizing personal effects belonging to Rev. Mahoney.   AVC ¶188.   This claim should now be dismissed as a matter of law for three reasons.

First, in electing to sue an Officer Doe in his official capacity, Rev. Mahoney is merely asserting a claim for non-monetary relief against the District of Columbia.   *See generally Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) (holding that a government official may be held personally liable only if sued in an individual rather than official capacity); *Atchinson v. District of Columbia,* 73 F.3d 418, 424 (D.C.Cir.1996) (same); *Eskridge v. Jackson,* 401 A.2d 986, 989 n. 7 (D.C.1979) (same under D.C. law); *Keith v. Washington,* 401 A.2d 468, 470-71 (D.C.1979) (same); *see also, Sunday Daskalea v. District of Columbia*, 227 F.3d 433, 448 (D.C.

---

[5]      *Aktielselskabet AF 21 November 2001 v. Fame Jeans Inc.*, 525 F.3d 8 (D.C. Cor. 2008) is not to the contrary.  *Aktielselskabet* holds that *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), has not changed the Rule 12(b)(6) standard.  It is plaintiffs' failure to allege facts in the complaint, which accepted as true with the benefits of all reasonable inferences derived from those facts would make out an equal protection claim, that entitles Defendants to judgment as a matter of law in this claim.  *See* 525 F.3d at 15 (citations omitted).

Cir. 2000) (naming official capacity defendant adds nothing to damages available in suit against

District).  Accordingly, the cause of action should be dismissed as redundant.  *See, e.g., Will v.*

*Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office")

(citing *Brandon v. Holt,* 469 U.S. 464 (1985)).

Second, as demonstrated above, plaintiffs did not suffer any violations of their rights

under the First, Fourth, or Fifth Amendments or RFRA.

Moreover, the allegations, taken at face value, assert nothing more than that a police

officer stopped Rev. Mahoney from defacing Pennsylvania Avenue in violation of § 22-3312.01,

caused him to identify himself, and seized evidence of a crime.  Were an officer to have been

sued individually, he would be entitled to summary judgment on qualified immunity grounds, as

none of the alleged actions violates clearly established law.  This Court's denial of plaintiffs'

TRO motion, (*see* AVC ¶¶ 122-24),  would have provided a reasonable police officer reason to

believe he enjoyed lawful authority to stop Rev. Mahoney's defacement of Pennsylvania

Avenue, and, in fact, to arrest him.  *See Pearson v. Calllahan*, 129 S.Ct. 808, 823 (2009) ("Police

officers are entitled to rely on existing lower court cases without facing personal liability for

their actions.")[6] Accordingly, he could also have reasonably that he had the lawful authority to

ask Rev. Mahoney to identify himself and to seize the chalk as evidence.  A police officer enjoys

qualified immunity for his actions where do not violate clearly established law.  *Malley v.*

*Briggs,* 475 U.S. 335, 341(1986) ("qualified immunity protects all but the plainly incompetent or

those who knowingly violate the law").  Rev. Mahoney's allegations supporting the Sixth Cause

---

[6]      Rev, Mahoney's YouTube video of his January 24, 2009 defacement of Pennsylvania
Avenue in front of the White House, referenced in AVC ¶ 131, reflects that Officer Doe is
entitled to qualified immunity.

of Action do not suggest a violation of clearly established law.   Accordingly, it would be futile

to allow the AVC to be amended to name any individual officer and the Sixth Cause Of Action

should be dismissed as a matter of law.

### CONCLUSION

For the foregoing reasons, this Court should grant Defendants judgment as a matter of

law on all claims contained in the Amended Verified Complaint.

Respectfully submitted,

PETER J. NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS, D.C. Bar No. 250746
Assistant Deputy Attorney General
Civil Litigation Division
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886
Facsimile: (202) 741-05908

/s/ Thomas L. Koger
THOMAS L. KOGER, D.C. Bar No. 427921
Senior Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 727-64170
Facsimile: (202) 741-5908
thomas.koger@dc.gov

/s/ Chad W. Copeland
CHAD W. COPELAND, D.C. Bar No. 982119
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 727-64170

Facsimile: (202) 741-5908

*Counsel for Defendants District of Columbia and*
*Chief of Police Cathy L. Lanier in her official capacity*