## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**PATRICK MAHONEY** *et al.*,            )
)
                    **Plaintiffs,**      )
)
          **v.**                          )          **Civil Action No. 09-105 (ESH)**
)
**DISTRICT OF COLUMBIA,** *et al.*,       )
)
                    **Defendants.**       )
_____)

## MEMORANDUM OPINION

Plaintiffs Reverend Patrick Mahoney, Kaitlin Mahoney Martinez, the Christian Defense Coalition, Survivors of the Abortion Holocaust, and Cheryl Conrad bring this action against defendants District of Columbia ("District"), Chief of the Metropolitan Police Department ("MPD") Cathy L. Lanier, and unidentified MPD officer "John Doe."[1]  Plaintiffs allege that defendants' refusal to permit them to engage in "chalk art" demonstrations on the pavement of the 1600 block of Pennsylvania Avenue in front of the White House violated the First, Fourth, and Fifth Amendments to the U.S. Constitution; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; and the District of Columbia First Amendment Rights and Police Standards Act of 2004 ("FARPSA"), D.C. Law 15-352 (2005) (codified at D.C. Code § 5-331.01, *et seq.*).  Before the Court is defendants' motion to dismiss the complaint or, in the alternative, for summary judgment and plaintiff's opposition thereto.  For the reasons set forth below, defendants' motion will be granted.

## BACKGROUND

In late 2008, plaintiffs began preparations for a January 24, 2009 demonstration on the

---

[1] Chief Lanier and John Doe are sued solely in their official capacities.

paved pedestrian promenade segment of the 1600 block of Pennsylvania Avenue, N.W., directly

between the White House and Lafayette Park ("the 1600 Block promenade"), to protest President

Obama's position on abortion and to protest the anniversary of the Supreme Court's decision in

*Roe v. Wade*, 410 U.S. 113 (1973). (*See* Am. Verified Compl. ("Compl.") ¶¶ 51-55, 57-60 [Dkt.

14]; Pls.' Mot. for TRO and Prelim. Inj. ("TRO Mot.") [Dkt. 4], Decl. of Rev. Patrick Mahoney

("Mahoney Decl."), Attach. 1 ("1st Henderson Letter") at 1; Defs.' Mot. to Dismiss the

Complaint or, in the Alternative, for Summ. J. ("Mot.") [Dkt. 17], Statement of Material Facts

("Defs.' SMF") ¶ 1.) This particular portion of Pennsylvania Avenue is under the jurisdiction of

the District of Columbia, while the National Park Service ("NPS") has jurisdiction over the

adjacent White House sidewalk and Lafayette Park. (NPS Opp'n to TRO Mot. ("NPS TRO

Opp'n") [Dkt. 9] at 1.) In addition, NPS is responsible, pursuant to an agreement with the

District, for maintaining and repairing the 1600 Block promenade. (*Id.*; *see also id.*, Decl. of

Ann Bowman Smith ("Smith Decl.") ¶ 5 & Ex. B.)

## I.      APPLICABLE STATUTES AND REGULATIONS

In the District, expressive assemblies are regulated by the "First Amendment

Assemblies" subchapter of FARPSA and related regulations. *See generally* D.C. Code §§ 5-

331.01 to -331.17; D.C. Mun. Regs. tit. 24, §§ 705-706, 711-712. Section 5-331.03 of the D.C.

Code declares that it is the District's policy to permit "First Amendment assemblies" – *i.e.*, those

conducted for social, political, and religious expression – "on the streets, sidewalks, and other

public ways," subject to "reasonable restrictions designed to protect . . . property . . . ." D.C.

Code § 5-331.03; *see also id.* § 5-331.02(1) (defining "First Amendment assembly"). Except in

three exempted situations, assembly organizers must give notice to the MPD and seek advance

approval for their event so that the District can coordinate the use of public spaces by multiple

groups and facilitate the allocation of police protection and other municipal assistance to assembly participants. *Id.* § 5-331.05(b)-(d). However, it is not an offense to assemble without having received advance approval. *Id.* § 5-331.05(a).

FARPSA requires the MPD to "recognize and implement" the policy announced in § 5-331.03 "when enforcing any restrictions" on assemblies. *Id.* § 5-331.04(a). The MPD may impose content-neutral "reasonable time, place, and manner restrictions" on expressive assemblies in three ways: prior to an assembly through the approval of an assembly plan; during an assembly for which no plan was approved; or during an assembly whose plan had previously been approved subject to restrictions, provided that the additional restrictions satisfy one of three specified criteria. *Id.* § 5-331.04(b) & (c).

Although the authority to grant an assembly plan is vested exclusively with the Chief of Police or her designee, *id.* § 5-331.06(a)(1), the municipal regulations specify that assembly plans shall be approved if nine enumerated conditions are satisfied. D.C. Mun. Regs., tit. 24, § 706.9 ("Regulation 706.9"). In addition, the exercise of assembly plan review and approval authority is subject to timing and notice requirements. *See* D.C. Code. § 5-331.06(b) & (c). For example, the Chief must provide a written rationale for any limitations on the approval of an assembly plan which the applicant had previously indicated would be "objectionable." *Id.* § 5-331.06(c)(3). An applicant may appeal restrictions and denials of approval to the Mayor or his designee, who must "expeditiously" issue a written ruling on the appeal before the assembly's planned date and time. *Id.* § 5-331.06(d).

## II.    PLAINTIFFS' ASSEMBLY PLANS

On November 24, 2008, plaintiffs notified the MPD and the Department of the Interior ("DOI") by letter of their intent to protest the *Roe* decision on January 24, 2009, on the 1600

Block promenade.  (*See* 1st Henderson Letter at 1; Compl. ¶¶ 83, 92, 94; Defs.' SMF ¶ 1.)  The

letter explained that plaintiffs planned "to create a variety of verbal and visual messages, by

making chalk drawings on the paved surface of Pennsylvania Avenue."[2]  (1st Henderson Letter

at 2.)  Plaintiffs' letter was received by Commander James Crane of the MPD Special Operations

Division ("SOD"), whose duties and responsibilities include the issuance or denial of assembly

plan approvals pursuant to FARPSA (Defs.' SMF ¶ 3), and by officials at the DOI, who

communicated the information to the NPS.[3]  (*See* Smith Decl. ¶ 6.)

On January 7, 2009, Commander Crane responded to plaintiff's November 24 letter.

(*See* TRO Mot., Mahoney Decl., Attach. 4 ("Crane Letter"); *see also* Compl. ¶¶ 97-98.)  Crane's

letter articulated the MPD's security concerns regarding the White House and requested

additional information that would help the MPD fashion a permit, such as the number of

anticipated participants, the starting and ending times of the demonstration, and whether

plaintiffs contemplated using any sound amplification or other equipment.[4]  (Crane Letter at 1-

2.)  The letter was accompanied by a form entitled "Assembly Plan Notification/Application for

Approval of Assembly Plan."  (*Id.* at 2, 3 (attachment).)  It also informed plaintiffs that chalking

the 1600 Block promenade and adjacent sidewalks would constitute defacement of public

property in violation of the District's criminal defacement statute, D.C. Code § 22-3312.01, as

well as NPS regulations, and that the MPD did not intend "to issue a demonstration permit that

---

[2] The letter also gave notice of an intended January 22, 2009 protest of the *Roe* decision "by words and demonstration" in Lafayette Park.  (1st Henderson Letter at 1.)

[3] On December 10, 2008, plaintiffs met with NPS and U.S. Park Police representatives to discuss the January 22 Lafayette Park plans, but no decision had yet been made regarding plaintiffs' request to conduct a chalking demonstration on January 24.  (TRO Mot., Mahoney Decl., Attach. 2 ("2nd Henderson Letter") at 1.)

[4] It is undisputed that plaintiffs' planned demonstration, as reflected in their November 24 letter, was not subject to any of FARPSA's exemptions from the advance approval requirement.

could be understood to exempt organizers or any other persons from the neutral application" of the District's defacement statute. (*Id.* at 2.)

On January 8, 2009, Margaret O'Dell, on behalf of the NPS, sent a letter to plaintiffs that explained the agency's jurisdiction over the White House sidewalk and its maintenance responsibilities for the portion of Pennsylvania Avenue adjacent to the sidewalk. (NPS TRO Opp'n., Ex. 1 ("O'Dell Letter").) O'Dell expressed the agency's view that chalking the grounds directly in front of the White House would violate District law, as well as NPS regulations prohibiting the defacement of "cultural . . . resources," 36 C.F.R. § 2.1(a)(6), and of "real property" on park lands under federal legislative jurisdiction. *Id.* § 2.31(a)(3) & (b). (*See* O'Dell Letter at 2.) O'Dell's letter also asserted that the prohibition on chalking was a reasonable time, place, and manner regulation consistent with the First Amendment. (*Id.* at 1-2.)

On January 9, 2009, plaintiffs responded to the MPD by letter, citing the District's past sponsorship of chalk art events on public streets in other locations and characterizing as "patently ridiculous" the refusal to permit chalking on the 1600 Block promenade. (TRO Mot., Mahoney Decl., Attach. 5 ("3rd Henderson Letter") at 4; Am. Comp. ¶ 106.) Plaintiffs' letter demanded that permission be granted for them to express their views "through the medium of sidewalk chalk" or else they would initiate litigation to compel such permission. (3rd Henderson Letter at 4.)

On January 12, 2009, Commander Crane transmitted to plaintiffs an "Assembly Plan Approval" that permitted the use of signs and banners but expressly withheld permission for sidewalk chalking:

> In accordance with the provisions of the First Amendment Assemblies Act of 2004, permission is hereby granted to Rev. Patrick Mahoney to conduct a First Amendment Assembly on Saturday, January 24, 2009 from 0700 hours (assembly time), [to] 1900 hours (disbanding time), consisting of no more than 5,000

persons. You are permitted to possess signs and banners. *However, there is no permission granted to use chalk or any other material to mark the surfaces of Pennsylvania Ave., N.W.*

(TRO Mot., Mahoney Decl., Attach. 6 ("Assembly Plan Approval") at 2 (emphasis added).) The Assembly Plan Approval also indicated that plaintiffs would need a U.S. Park Police permit in order to make any use of the White House sidewalk or Lafayette Park. (*Id.*)

## III. THE INSTANT ACTION

On January 16, 2009, plaintiffs initiated this action and moved for a temporary restraining order ("TRO") and preliminary injunction, seeking to stop the District and the MPD from denying them permission to engage in "chalk art" as part of their approval to demonstrate on January 24. On the evening of January 20, the day of the presidential inauguration, defendants and the NPS, as *amicus curiae*, filed oppositions to plaintiffs' motion. [Dkt. 8-9.] After hearing argument on January 22, the Court denied injunctive relief on the grounds that plaintiffs failed to establish a substantial likelihood of success on the merits. (*See* Jan. 22, 2009 Minute Order.)

On January 24, 2009, Mahoney and others went to the 1600 block of Pennsylvania Avenue, N.W. with the intent to conduct their planned demonstration. (*See* Compl. ¶¶ 125-127.) Commander Crane and other MPD officers were also present. (*Id.* ¶ 128.) Mahoney began to chalk the pavement, but MPD directed him to cease doing so, took the chalk away from him, and required him to identify himself. (*Id.* ¶¶ 132-134; Defs.' SMF ¶ 8; *see also* Defs.' Mot., Ex. A (video recording of incident).) Mahoney was not taken into custody or charged with any offense.

On February 25, 2009, plaintiffs filed an amended verified complaint asserting six causes of action. Plaintiffs' first cause of action ("Count I") contends that the District's defacement statute, on its face, violates the First Amendment's Speech Clause. (Compl. ¶¶ 157-164.) Plaintiffs' second, third, fourth, and fifth causes of action assert that by threatening to apply the

defacement statute to plaintiffs' activities, defendants violated plaintiffs' rights under the First Amendment's Speech and Free Exercise Clauses ("Count II"), RFRA ("Count III"), FARPSA ("Count IV"), and the equal protection component of the Fifth Amendment's Due Process Clause ("Count V"). (*Id.* ¶¶ 165-186.) Plaintiffs' final cause of action alleges that the MPD's efforts to prevent Mahoney from chalking in front of the White House on January 24, 2009, violated his rights under the First, Fourth, and Fifth Amendments as well as RFRA ("Count VI"). (*Id.* ¶¶ 187-198.)

On March 17, defendants filed a motion to dismiss or, in the alternative, for summary judgment. [Dkt. 17-19.] On April 16, plaintiffs filed their opposition [Dkt. 20], and defendants filed their reply on May 5 [Dkt. 23]. On April 27, an annual "Chalk-In" event took place on H Street, N.W., between 21st and 22nd Streets, in which participants chalked the streets and sidewalks. (Pls.' Mot. to Supplement Opp'n to Mot. ("Pl.'s Mot. to Supplement") [Dkt. 24-25] at 2-3.) On May 6, 2009, plaintiffs sought to supplement their opposition in response to the Chalk-In event, and the Court granted the motion in light of defendants' consent.

## ANALYSIS

## I. COUNTS I, II, AND IV: FREEDOM OF SPEECH CLAIMS

The central dispute in this action is whether the government may prevent plaintiffs from chalking the 1600 Block promenade consistent with the Constitution. However, several threshold issues are not disputed. First, the parties agree that defendants were acting under the color of state law when they prevented plaintiffs from chalking. Second, the creation of words or images through chalk or any other medium is an act of expression that implicates the First Amendment. Third, the paved street of the 1600 Block promenade is public property that constitutes a "quintessential public forum[]" where "the government may not prohibit all

communicative activity," because "streets and parks . . . 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring)).  Fourth, the government may "regulate competing uses of public forums" by "impos[ing] a permit requirement on those wishing to hold a march, parade, or rally."  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (considering facial challenge to county ordinance requiring permits for assemblies and parade).

"None of this leads, however, to the conclusion that [plaintiffs] had a constitutional right to be free of all restraints."  *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 372 (D.C. Cir. 1992).  "'The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all,'" *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518, 1526 n.66 (D.C. Cir. 1984) (quoting *Hague*, 307 U.S. at 515 (Roberts, J., concurring)), and "[t]he government is not precluded . . . from regulating expressive activities conducted on the White House sidewalk," *id.* at 1527 (emphasis omitted), the public promenade directly in front of it, or any other public property.  Although plaintiffs "may have First Amendment freedom to use [the 1600 Block promenade] for protected speech," this right "is not accompanied by an unlimited license" to speak in that traditional public forum through whatever medium and manner they see fit, "any more than the right to address an audience from the platform of a public monument would confer upon a speaker the freedom to paint a message on it, or to readorn with graffiti property owned by the government . . . ."  *People for the Ethical Treatment of Animals v. Giuliani* ("*PETA*"), 105 F. Supp. 2d 294, 318 (S.D.N.Y. 2000); *cf. United States v. Murtari*, No.

07-CR-387, 2007 WL 3046746, at *5 (N.D.N.Y. Oct. 16, 2007) (noting that even though property damage statute under which defendant was charged did not prohibit defacement, he was not "free to write in chalk all over the federal plaza").  Moreover, neither the First Amendment nor FARPSA grants plaintiffs an unlimited right to tangibly alter the appearance of public property using chalk or any other medium, permanent or otherwise, nor does it require that *this* particular street be available to serve as a writing tablet.  *See Christian Knights*, 972 F.2d at 372 ("When it comes to use of a public forum such as a street, . . . speakers do not have a constitutional right to convey their message whenever, wherever and however they please.").

With  these guiding principles in mind, the Court will now turn to plaintiffs' facial and as-applied challenges under the First Amendment and FARPSA.

### A.    Count I: Facial Challenge

Count I attacks the defacement statute, D.C. Code § 22-3312.01, as unconstitutional on its face.  Facial challenges are generally disfavored because they require courts to "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" and because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *See Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).  Because the doctrines governing facial challenges are complex, the Court notes the instructive discussion offered by the Supreme Court in *New York State Club Association, Inc. v. City of New York*:

> Although . . . facial challenges are sometimes permissible and often have been
> entertained, especially when speech protected by the First Amendment is at stake,
> to prevail on a facial attack the plaintiff must demonstrate that the challenged law
> either "could never be applied in a valid manner" or that even though it may be

validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798 (1984). Properly understood, the latter kind of facial challenge is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power. *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940). Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that "every application of the statute created an impermissible risk of suppression of ideas," *Taxpayers for Vincent*, [466 U.S. at 798 n.15], and the second kind of facial challenge will not succeed unless the statute is "substantially" overbroad, which requires the court to find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." [*Id.* at 801.]

487 U.S. 1, 11 (1988) (citations omitted); *accord Initiative and Referendum Institute v. U.S. Postal Serv.*, 417 F.3d 1299, 1312 (D.C. Cir. 2005); *Wash. State Grange*, 128 S. Ct. at 1190 & n.6.

Regardless of how plaintiffs attempt to cast their arguments, their facial attack on the statute fails in light of the defacement statute's text and applicable legal doctrines.

### 1. D.C. Code 22-3312.01

Section 22-3312.01, previously codified as § 22-3112.1, is part of the criminal code that addresses "[t]respass" and "[i]njuries to [p]roperty." *See* D.C. Code, tit. 22, ch. 33. The statute provides that

[i]t shall be unlawful for any person or persons willfully and wantonly to disfigure, cut, chip, or cover, rub with, or otherwise place filth or excrement of any kind; to write, mark, or print obscene or indecent figures representing obscene or [*sic*] objects upon; to write, mark, draw, or paint, without the consent of the owner or proprietor thereof, or, in the case of public property, of the person having charge, custody, or control thereof, any word, sign, or figure upon:

(1) Any property, public or private, building, statue, monument, office, public passenger vehicle, mass transit equipment or facility, dwelling or structure of any kind including those in the course of erection; or

(2) The doors, windows, steps, railing, fencing, balconies, balustrades, stairs, porches, halls, walls, sides of any enclosure thereof, or any movable property.

D.C. Code § 22-3312.01.  "Property" includes streets and sidewalks, *see id.* § 22-3312.05(9), and

the statute also applies to public property under federal jurisdiction.  *See United States v. Bohlke*,

No. 87-M-1645, 116 Daily Wash. L. Rep 1697, 1700 (D.C. Super. Ct. July 14, 1988) (denying

motion to dismiss and convicting defendant, under statute's previous codification at § 22-3112.1,

for defacing White House pillar); *United States v. Frankel*, 739 F. Supp. 629, 632 (D.D.C. 1990)

(denying motion to dismiss transfer to federal court of defendants' prosecution for defacing U.S.

Capitol), *sentences following plea aff'd sub nom. United States v. Mastropierro*, 931 F.2d 905

(D.C. Cir. 1991).  Violators face criminal penalties of up to 180 days' imprisonment and a fine of

not less than $250 or more than $1000.  D.C. Code § 22-3312.04.

> **2.      Every application of the statute does not create an impermissible risk of suppression.**

Plaintiffs contend that the defacement statute operates as "a classic prior restraint on

speech" because some of its terms prohibit the writing, marking, drawing, or painting upon

"public properties, including streets and sidewalks, which constitute quintessential public

forums."  (Compl. ¶¶ 158-160.)  They also contend that the MPD supposedly "ignores" the

constraints placed by Regulation 706.9 upon the MPD's discretion to deny approval for assembly

plans, and as a result the defacement statute gives defendants "unbridled discretion" to regulate

speech because its terms do not specify when consent must be granted to write upon or mark

government property.  (*Id.* ¶¶ 161-164.)  Plaintiffs rely on cases such as *Forsyth County*, 505

U.S. 123; *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988); and *Thomas v.

Chicago Park District*, 534 U.S. 316 (2002), each of which considered whether a licensing

regime (or other direct regulation of expression) gave government decisionmakers unlimited

discretion to restrict speech.  (*See* Pls.' Opp'n [Dkt. 20] at 5-9.)  Such a regime would be

unconstitutional because it creates "an impermissible risk of suppression of ideas."  *Taxpayers*

*for Vincent*, 466 U.S. at 798 n.15 (citing prior restraint and licensing cases).

The defacement statute is not subject to attack under this theory because it is not "unconstitutional in every conceivable application . . . ." *Taxpayers for Vincent*, 466 U.S. at 796. Section 22-3312.01 is an exercise of the District's legislative authority to protect property rights. *See Hannibal & St. J.R. Co. v. Husen*, 95 U.S. 465, 470-71 (1877) (noting that state's legislative police power extends to "the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others"). It is true that the law implicates First Amendment interests because the statute's terms make it unlawful "to write, mark, draw, or paint . . . upon" public property – including traditional public forums such as streets and sidewalks – without the government's permission. But the law also prohibits disfiguring, cutting, or chipping real or movable property, or covering such property with filth or excrement, and these prohibitions are "perfectly reasonable" with respect to "most of the publicly owned objects mentioned in" the statute. *Taxpayers for Vincent*, 466 U.S. at 801; *cf. Lederman v. Giuliani*, No. 98-CV-2024, 2001 WL 902591, at *6-*7 (S.D.N.Y. Aug. 7, 2001) (rejecting facial challenge to substantially identical New York defacement statute brought by plaintiff who argued it was unconstitutional prohibition on chalking of public property).

Plaintiffs' reliance upon *Forsyth County* and similar cases is therefore misplaced. *See also Taxpayers for Vincent*, 466 U.S. at 798 & n.15 (distinguishing prior restraint and licensing cases when considering facial challenge to city ordinance making it unlawful to "paint, mark or write on, or post or otherwise affix, any hand-bill or sign to" public property). The statute is not a licensing regime designed "to regulate speech per se," but rather a trespass statute aimed at *conduct* which the District may legitimately prohibit. *Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 933 (9th Cir. 2009) (finding no threat of censorship where statute permitted

Secretary of State "to authorize the otherwise prohibited provision of 'material support or resources' to a designated foreign terrorist organization," where "material support" was not equivalent to political expression or association). Even the licensing cases recognize that the mere fact that a law gives the government some measure of discretion does not open that law to facial challenge as a prior restraint. *Plain Dealer*, 486 U.S. at 759. Instead, it "must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* Section 22-3312.01 lacks just such a nexus.

First, the defacement statute "does not punish only [defacement] engaged in for the purpose of expressing views." *United States v. O'Brien*, 391 U.S. 367, 375 (1968). Instead, it prohibits all intrusions upon another's property, regardless of motivation, that tangibly alter the appearance of the property. Plaintiffs have offered no authority to suggest that such intrusions are historically associated with constitutionally privileged speech, and "it is an untenable position that conduct such as vandalism is protected by the First Amendment merely because those engaged in such conduct 'intend[ ] thereby to express an idea.'" *Riely v. Reno*, 860 F. Supp. 693, 702 (D. Ariz. 1994) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)); *see also PETA*, 105 F. Supp. 2d at 318; *Wilson v. Johnson*, 04-CV-059, 2005 WL 2417057, at *7 (E.D. Tenn. Sept. 30, 2005) ("Plaintiff got caught defacing the doors and walls of two University buildings, conduct that constitutes vandalism, and vandalism is not protected by the First Amendment."), *aff'd*, 247 F. App'x 620 (6th Cir. 2007).

Second, any burdens upon speech are independent of the expression's content and incidental to the statute's legitimate purpose of protecting property. *See Nat'l Paint & Coatings Ass'n v. City of Chicago*, 803 F. Supp. 135, 143 (N.D. Ill. 1992) (finding, for purposes of

interstate commerce analysis, that ordinance regulating possession of graffiti-type spray paints and markers served legitimate local interest in "preserving property values, deterring illegal activity and protecting the aesthetic character of the City's neighborhoods from the devastation of graffiti vandalism"). The statute's narrow focus leaves many alternative forms of speech, such as signs or banners, the use of natural or amplified sound, or any other medium that does not require changing the appearance of another's property by writing a message directly "upon" it.

Because it is not true that § 22-3312.01 "could never be applied in a valid manner," *Taxpayers for Vincent*, 466 U.S. at 798, plaintiffs' facial challenge under this theory fails as a matter of law.

### 3. An overbreadth challenge is not appropriate.

The Court will also consider plaintiffs' facial challenge to § 22-3312.01 as one brought under the traditional formulation of the "overbreadth" doctrine, because the Supreme Court has not always consistently described whether the rationale for permitting a facial attack upon a licensor's excess discretion is distinct from the rationale for permitting a facial overbreadth challenge. *Compare, e.g.*, *Wash. State Grange*, 128 S. Ct. at 1190 & n.6 (distinguishing facial challenges based on theory that "the law is unconstitutional in all of its applications" from those based on overbreadth), *with Forsyth County*, 505 U.S. at 129 (describing facial challenges to licensing regimes as subset of overbreadth doctrine); *see also Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1320-21 (Fed. Cir. 2002) (discussing discrepancies in Supreme Court's discussion of overbreadth doctrine). To hold that § 22-3312.01 is invalid on its face "by reason of the overbreadth doctrine," the Court must conclude that "the trespass [statute], *taken as a whole,* is substantially overbroad judged in relation to its plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)

("[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."). Such a finding would "suffice[] to invalidate *all* enforcement of [the] law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Hicks*, 539 U.S. at 118-19 (quoting *Broadrick*, 413 U.S. at 615).

"This is not, however, an appropriate case to entertain a facial challenge based on overbreadth," *Taxpayers for Vincent*, 466 U.S. at 801, because "the parties challenging the statute are those who desire to engage in protected speech that the [supposedly] overbroad statute purports to punish . . . ." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504 (1985). "[T]he overbreadth doctrine is essentially a *jus tertii* device; it evolved in order to permit one properly charged under a statute to raise the First Amendment rights of others, not charged, whose associational or expressive rights might be chilled by enforcement of overly broad legislation." *Waters v. Barry*, 711 F. Supp. 1125, 1133 (D.D.C. 1989); *accord Hutchins v. District of Columbia*, 188 F.3d 531, 548 n.14 (D.C. Cir. 1999) (*en banc*) ("[A]n assertion of a facial challenge under the First Amendment overbreadth doctrine . . . is really a standing exception . . . for parties *engaged in unprotected conduct* to challenge applications of the statute against third parties not before the court." (emphasis added)). "[W]hen, as here, the plaintiffs are themselves engaged in protected activity – when the challenged statute would have no greater impact upon the rights of nonparties than it would have upon the rights of the parties before the Court – there is no need to employ a traditional overbreadth analysis." *Waters*, 711 F. Supp. at 1133.

Plaintiffs' efforts to chalk on a public street already implicate those portions of § 22-3312.01 that most directly raise First Amendment concerns, so there can be no basis to conclude

that the law "applies to any conduct more likely to be protected by the First Amendment than [plaintiffs'] own [expressive activities]." *Taxpayers for Vincent*, 466 U.S. at 802. If the defacement statute "may be validly applied to [plaintiffs], it can be validly applied to most if not all of the [writing, marking, drawing, or painting upon public property done by] parties not before the Court." *Id.* There is thus no "realistic danger that the ordinance will significantly compromise recognized First Amendment protections of individuals not before the Court," *id.*, "no want of a proper party to challenge the statute, [and] no concern that an attack on the statute will be unduly delayed or protected speech discouraged." *Spokane Arcades*, 472 U.S. at 502.

It is clear that plaintiffs' facial challenge – whether based on a theory of unbridled discretion or substantial overbreadth – must fail, and thus, Count I will be dismissed for failure to stated a claim upon which relief can be granted.[5]

For all of these reasons, Count I will be dismissed as a matter of law.

### B.     As-Applied Challenges

Plaintiffs also bring "as-applied" challenges to defendants' reliance upon the defacement

---

[5] Assuming *arguendo* that an overbreadth challenge were appropriate here, which it is not, such a challenge would fail for the reasons that the Supreme Court rejected a similar overbreadth challenge to a local trespass law in *Hicks*. *See* 539 U.S. at 123-24 (holding that trespass policy governing public housing development's "privatized" public streets was not facially overbroad, because policy applied to all individuals entering the development's streets and "not just to those who seek to engage in expression," where Court had assumed *arguendo* that streets remained public forums and that policy of banning individuals who lacked "'legitimate business or social purpose for being on the premises'" was unlawful grant of unfettered discretion to housing development's manager). As was the case with the "no-return" policy in *Hicks*, the defacement statute here cannot be deemed substantially overbroad. Even if the defacement statute unlawfully gave defendants unbridled discretion to grant or deny consent to write upon or mark a public street, the statutory text plainly prohibits many other forms of defacing conduct with respect to many other types of property without raising any First Amendment concerns. "[J]udged in relation to its plainly legitimate sweep," *id.* at 122, the defacement statute is not substantially overbroad, and plaintiffs' facial challenge would, if permitted to proceed, fail. *See also id.* at 124 ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating).").

statute to restrict plaintiffs' ability to chalk the 1600 Block promenade.

## 1. Count II: First Amendment - Speech Clause

Count II alleges that defendants violated plaintiffs' freedom of speech "[b]y threatening to apply a provision of the criminal code of the District of Columbia" to their expressive conduct. (Compl. ¶ 170.) "Plaintiffs acknowledge that the District may regulate all such activities" enumerated in the defacement statute, "including chalk art, whether such a statute exists or not." (Opp'n at 9 n.2) They argue, however, that those laws are unconstitutional at applied to them.[6]

With respect to any "as-applied" challenge, it is well settled that "[t]he permissible mode of regulati[ng]" the use of a traditional public forum "is summarized under the familiar heading 'time, place and manner.'" *Christian Knights*, 972 F.2d at 372; *Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 32 (D.D.C. 2006) (rejecting as-applied challenge, brought by Rev. Mahoney and Christian Defense Coalition, to restriction as to where they could demonstrate outside the Red Mass). "[R]easonable time, place, and manner regulations" are valid "as long as the

---

[6] Plaintiffs appear to frame their "as-applied" challenge in terms of *Forsyth County*'s requirement of "narrowly drawn, reasonable and definite standards." 505 U.S. at 133. (*See* Opp'n at 10.) This is not the standard for an as-applied challenge, and plaintiffs' argument is based on several incorrect premises, owing to plaintiffs' erroneous conclusion that D.C. Code § 22-3312.01 is analogous to a licensing provision governed by *Forsyth County* and similar cases, *see supra* Section III.A.1, as well as their misinterpretation of FARPSA and Regulation 706.9. *See infra* Section III.B.2.

However, even if *Forsyth County* were applicable by virtue of the MPD's reliance upon the defacement statute when carrying out its duties under FARPSA, the purpose of objective standards is to help ensure that a licensing scheme is valid *on its face*, because "without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of 'as applied' challenges render the licensor's action in large measure effectively unreviewable." *Plain Dealer*, 486 U.S. at 757. Because the defacement statute is not unconstitutional on its face, and because plaintiffs disavow any challenge to FARPSA's facial validity (Opp'n at 3), the *Forsyth County* considerations would not inform the Court's analysis of plaintiffs' "as-applied" claims.

restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (quoting *United States v. Grace,* 461 U.S. 171, 177 (1983)); *White House Vigil*, 746 F.2d at 1527. The undisputed facts show that defendants' reliance upon § 22-3312.01 when imposing the chalking restriction constitutes just such a valid regulation of the place (*i.e.*, the promenade) and manner (*i.e.*, writing directly upon the surface of the promenade) of plaintiff's speech.[7] And thus, plaintiffs' "as-applied" challenge fails.

### a) Content-neutrality

"A regulation that *serves purposes* unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791-92 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence* ("*CCNV*"), 468 U.S. 288, 293 (1984)) (first emphasis added); *Emergency Coalition to Defend Educ. Travel v. U.S. Dep't of the*

---

[7] Plaintiffs have submitted an affidavit by Rev. Mahoney, pursuant to Rule 56(f)(2), asserting that they are "unable to present evidence essential to demonstrate a genuine issue as to certain material facts," because that evidence is in defendants' possession. (Opp'n, Rule 56(f) Aff. of Rev. Mahoney ("Rule 56(f) Aff.") ¶ 6.) The affidavit seeks discovery relating to (1) the District's prior application of the defacement statute; (2) the type of substance used by defendants to mark the White House pavement for the 2005 inaugural parade; (3) evidence of prior attempts to clean chalk from the White House pavement; and (4) the District's prior approval or denial of chalking in locations other than the 1600 block of Pennsylvania Avenue, including "all District streets and sidewalks." (*Id.* ¶¶ 1-4.) For the reasons discussed herein, the Court denies the request because the discovery sought is not relevant to the Court's analysis of the issues presented and therefore would not create triable issues of fact. *See Brookens v. Solis*, 616 F. Supp. 2d 81, 96-97 & n.16 (D.D.C. 2009). And even if the discovery sought was arguably relevant, plaintiffs offer only "conclusory assertion[s] without any supporting facts" regarding their belief that further discovery would create a triable issue. *See Byrd v. E.P.A.*, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999) (affirming grant of summary judgment for defendant and finding no abuse of discretion in denying Rule 56(f) request for discovery where plaintiff had "merely alleged that 'there may well be knowledge on the part of [the defendant's] employees or undisclosed documents" that would create fact issues).

*Treasury*, 545 F.3d 4, 12 (D.C. Cir. 2008). "[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1071 (9th Cir. 2006). The defacement statute is content-neutral on its face, as its plain language prohibits unauthorized property-altering conduct (such as chipping, writing, or covering with filth) without reference to the conduct's motivation. *See O'Brien*, 391 U.S. at 375.

Similarly, defendants' refusal to let plaintiffs chalk the 1600 Block promenade was content-neutral because it was justified without reference to the content of plaintiff's speech. After plaintiffs informed defendants of their intent to demonstrate against abortion and the *Roe* decision (*see* 1st Henderson Letter at 1-2), the responses from both the MPD and NPS took issue only with how chalking the promenade and the adjacent sidewalk would constitute defacement in violation of § 22-3312.01 and analogous federal regulations. (*See* Crane Letter at 2; O'Dell Letter at 1-2.) "This justification . . . 'ha[s] nothing to do with content,'" *Ward*, 491 U.S. at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988) (O'Connor, J.)), and it does not "even remotely suggest a hidden purpose to regulate speech because of a disagreement with appellants' message." *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655 (D.C. Cir. 1994). Defendants' invocation of the defacement statute when undertaking FARPSA's undisputedly constitutional approval process was consistent with FARPSA's stated policy of permitting "reasonable restrictions designed to protect . . . property . . . ." *See* D.C. Code § 5-331.03. The content-neutral nature of defendants' decision is also corroborated by the Assembly Approval Plan issued by Commander Crane, which gave plaintiffs permission for a twelve-hour, 5,000-person demonstration with signs and banners in the precise location that they requested. (*See* Assembly Approval Plan at 2.) The approved assembly plan did not impose "any barrier to

delivering to the media, or to the public by other means, [plaintiffs'] intended message . . . ."

*CCNV*, 468 U.S. at 293.

Plaintiffs nonetheless argue that defendants selectively enforced the defacement statute because they harbored content-discriminatory motives. (*See* Opp'n at 14; *see also* Compl. ¶ 181.) Plaintiffs' only basis for this contention is that defendants have previously permitted others to chalk on public property in other parts of the District. The argument fails because plaintiffs merely point to dissimilar incidents which do not support – and even undermine – the argument that defendants applied the law in a content-based way.

First, the existence of other chalking events in other locations throughout the District, such as the April 26 "Chalk-In" on H Street, has no bearing on defendants' decision to prohibit chalking on the 1600 Block promenade. (*See* Pls.' Mot. to Supplement at 2-3.) "[T]he White House area is a 'unique situs' for [F]irst [A]mendment activity," *White House Vigil*, 746 F.2d at 1533 (quoting *A Quaker Action Group v. Morton*, 516 F.2d 717, 729 (D.C. Cir. 1975)), and defendants have unique interests in the aesthetic maintenance of that area. Indeed, as defendants represented during the TRO hearing, the parties "wouldn't be here" if plaintiffs had sought to engage in a chalk art demonstration in a different location. (Jan. 22, 2009 Hr'g Tr. on TRO Mot. ("TRO Hr'g Tr.") at 62:5-8.) They further offer unrebutted evidence that no proposed assembly plan that contemplated "the marking of Pennsylvania Avenue in front of the White House, or the adjoining sidewalks, with chalk or any other substance" has been approved under FARPSA. (Defs.' SMF ¶ 9.)[8]

---

[8] The complaint does not allege anything to the contrary, and plaintiffs' counsel conceded during the TRO hearing that no one has ever received permission to chalk the 1600 Block promenade. (*See* TRO Hr'g Tr. at 50:1-10.) In light of this concession, the Court rejects plaintiffs' belated and unsupported attempt to dispute this fact. (*See* Opp'n, Pls.' Response to Defs.' SMF ¶ 9.) Moreover, plaintiffs cannot dispute this fact without any evidence, and

The Court also takes notice of the judicial opinions which show how the defacement statute (when codified at § 22-3112.1) was previously used to prosecute conduct, whether politically expressive or not, that tangibly altered the appearance of public property in the District – including the White House. *See Bohlke*, 116 Daily Wash. L. Rep. at 1697 n.2 (prosecution for defacing White House pillar to protest government actions in Central America); *Frankel*, 739 F. Supp. at 632 (prosecution for defacing U.S. capitol to protest condition of the homeless); *Craig v. United States*, 523 A.2d 567, 567-68 (D.C. 1987) (prosecution for defacing municipal bus stop passenger shelter with phrase "Fool's Gold" and two dollar signs).

Second, the argument that defendants selectively enforced the statute against plaintiffs because of their views is contradicted by plaintiffs' allegation that on at least two occasions, the MPD had advance knowledge of plaintiffs' intent to demonstrate against abortion through chalk art and nonetheless permitted plaintiffs to go forward. (*See generally* Compl. ¶ 56.) In 2004, Rev. Mahoney, Kaitlin Martinez, and the Christian Defense Coalition allegedly held a chalk demonstration near Constitution Avenue and 15th Street "in the personal physical presence of" the previous MPD chief, "who allowed them to carry out the activity." (*Id.* ¶ 56(a)(ii).) In 2007, these same plaintiffs allegedly sought and received the MPD SOD's advance approval for a similar chalk art demonstration near George Washington University. (*Id.* ¶ 56(b)(iv) & (v).) During that demonstration, members of the public objected to plaintiffs' expression "and tried to

---

significantly, in their Rule 56(f) affidavit, they do not even suggest that further discovery might aid them in filling this enormous evidentiary gap. Instead, they seek to learn about chalking in locations other than in front of the White House. (*See* Rule 56(f) Aff. ¶ 4.)

It is also of no significance that uniformed Secret Service officers allegedly did not stop plaintiffs from chalking on or near the 1600 Block promenade on one occasion in April 2006 (*see* Compl. ¶ 56(c)(v) & (vi)), since the Secret Service was not acting as defendants' agent, and its powers do not extend to granting permits to use the promenade. *See generally* 18 U.S.C. § 3056 ("Powers, authorities, and duties of United States Secret Service").

have it stopped." (*Id.* ¶ 56(b)(vi).)  MPD SOD officers intervened, "confirmed that [plaintiffs] were permitted to conduct the chalk art demonstration, and kept them from being molested while they completed their demonstration." (*Id.* ¶ 56(b)(vii).)

Even construing all the evidence in the light most favorable to plaintiffs, the Court must conclude that "there is nothing to support the notion that defendants' denial of [plaintiffs'] application was neither content-neutral nor based on a desire to promote legitimate governmental interests." *Bosscher v. Twp. of Algoma*, 246 F. Supp. 2d 791, 800 (W.D. Mich. 2003) (granting motion to dismiss First Amendment claim after rejecting argument that denial of construction permit was content-based, where defendant's planning commission had concluded that denial would serve legitimate content-neutral "aesthetic concerns").

### b) Substantiality of governmental interest and narrow tailoring

Whether the defacement statute's application to chalking is "narrowly tailored to serve a significant governmental interest" is a determination of law for the Court. *White House Vigil*, 746 F.2d at 1528-29; *accord Mesa v. White*, 197 F.3d 1041, 1046 & n.5 (10th Cir. 1999) (citing *White House Vigil* and noting that whether government "demonstrated that [its asserted interest] is a significant government interest" "is a legal rather than factual question").  Defendants assert a governmental interest in, among other things, "preserving the aesthetics . . . of the paved part of Pennsylvania Avenue around the White House . . . ." (*See* Mot. at 14.)  The Court agrees and concludes that the restriction on chalking is a narrowly tailored means of advancing the government's significant interests, which are unrelated to the suppression of expression, in keeping the 1600 Block promenade free of "visual clutter," *Taxpayers for Vincent*, 466 U.S. at 808, and "conserving [District] property" through measures "designed to limit the wear and tear" to which they are subjected. *CCNV*, 468 U.S. at 299; *see also id.* at 297 ("[the Court] think[s]"

the government "has a legitimate interest in ensuring that the National Parks are adequately protected").

There can be no doubt that "[t]he government has a substantial interest in the preservation and enhancement of the human environment," and "aesthetics are a proper focus of governmental regulation." *White House Vigil*, 746 F.2d at 1528. This includes maintaining property held in trust for the public "in an *attractive and intact* condition." *CCNV*, 468 U.S. at 296 (noting substantial governmental interest in "maintaining the parks in the heart of our Capital in an attractive and intact condition") (emphasis added). In some ways, "the government's relationship to things under its dominion and control is virtually identical to a private owner's property interest in the same kinds of things, and . . . [the government], 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Taxpayers for Vincent*, 466 U.S. at 815 n.31 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). The byways directly in front of the White House are a "unique resource[] that the Federal Government holds in trust for the American people," *CCNV*, 468 U.S. at 290; *see, e.g.*, *White House Vigil*, 746 F.2d 1518 (upholding restriction on display of signs and placards within the "center zone" of the sidewalk outside the White House), and the District has significant interests in preserving the promenade for use and enjoyment by the public by "proscribing intrusive . . . formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806.

Plaintiffs do not appear to dispute defendants' substantial interests in maintaining the visual and structural integrity of the 1600 Block promenade. (*See* Opp'n at 14 n.3 ("Plaintiffs do not contend that the District may not impose restrictions on expressive activity in furtherance of the protection of public property.").) Nor could they, given that the complaint acknowledges that

the promenade has been closed to vehicular traffic since the 1990s, that it was converted to a pedestrian plaza, and that its paving, "sometimes referred to as 'rustic paving,' . . . constitutes an aesthetically driven selection" of materials that "provide[s] a 'colored' street surface different from typical asphalt surfaces." (Compl. ¶¶ 87-91.) Instead, plaintiffs claim that no visible signs of chalking or damage will result if they are permitted to chalk the promenade. To support this claim, plaintiffs proffer that no such damage appeared after Rev. Mahoney marked a letter "P" upon the surface on January 24, 2009, nor after the chalk was apparently removed. (*Id.* ¶¶ 143-44; *see also* Opp'n at 15 & n.6.)

This argument is unpersuasive. The government's interest in enforcing the defacement statute to protect the 1600 Block promenade should "not be judged solely by reference to the demonstration at hand" nor by reference to the harm caused (or not caused) by a single letter written by a single demonstrator. *CCNV*, 468 U.S. at 296-97. Instead, "courts must look to what would happen if *every* individual to which a restriction applies were freed of its limitations," *Mahoney*, 454 F. Supp. 2d at 35, and defendants were compelled to grant each and every request to chalk the promenade. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981) (noting that "there would be a much larger threat to the State's interest . . . if all other religious, nonreligious, and noncommercial organizations could likewise" enjoy the place and manner exemption sought by the plaintiffs). In addition, the significance of the interest "must be assessed in light of the characteristic nature and function of the particular forum involved." *Id.* at 651.

The area near the White House "attract[s] great numbers of visitors who come . . . to see and experience" the president's home. *Heffron*, 452 U.S. at 651 (contrasting commonplace public streets with state fair). Access to this "unique situs for demonstration activity" is "scarce"

because of the many "competing applicants" who hope to use that space. *Quaker Action Group*, 516 F.2d at 727. "Absent the prohibition on [chalking], there would be other groups who would demand permission to deliver an asserted message by [chalking the promenade]. Some of them would surely have as credible a claim in this regard as do[] [plaintiffs], and the denial of [permission] to still others would present difficult problems for the [MPD]." *CCNV*, 468 U.S. at 297; *see also Mahoney*, 454 F. Supp. 2d at 35.

Because permission to chalk "cannot be meaningfully limited to" plaintiffs, *Heffron*, 452 U.S. at 653, the likely widespread use of chalk art directly in front of the White House would contribute to visual clutter, thereby undermining the District's interest in maintaining an area of singular national importance. *See, e.g.*, *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 183, 187 (1st Cir. 1996); *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1013 (9th Cir. 1996). In addition, basic principles of friction and erosion suggest that frequent chalking and cleaning efforts would accelerate the "wear and tear" inflicted upon the rustic paving's surface. *CCNV*, 468 U.S. at 299.[9]

For similar reasons, the restriction on chalking upon the 1600 Block promenade is also narrowly tailored to serve the government's substantial interests, because it "target[s] and [eliminates] no more than the exact source of the 'evil' [it seeks] to remedy." *Taxpayers for Vincent*, 466 U.S. at 808.[10] "[I]t is the tangible medium of expressing the message" – *i.e.*,

---

[9] Because courts have long recognized the government's substantial interests in promoting aesthetics through the visual and physical maintenance of public property, the Court need not rely upon the factual assertions of *amicus* regarding the actual damage caused to the promenade by chalk art and the power-washing methods used to remove chalk from the surface. (*See* Smith Decl. ¶ 4.) Therefore, plaintiffs' Rule 56(f) requests for discovery as to this issue are irrelevant to the Court's analysis.

[10] A challenged time, place, or manner restriction need not be "the least restrictive" method of furthering the government's interest. *Ward*, 491 U.S. at 798.

chalking – "that has the adverse impact on the appearance of the landscape. . . . Here, the substantive evil – visual [clutter] – is not merely a possible by-product of the activity, but is created by the medium of expression itself. . . . [T]herefore, the application of the [restriction] in this case responds precisely to the substantive problem which legitimately concerns the [District]" and "curtails no more speech than is necessary to accomplish its purpose." *Id.* at 810; *accord White House Vigil*, 746 F.2d at 1536 n.112.

It is not for the Court to decide "how much protection the [promenade] require[s] or how an acceptable level of preservation is to be attained." *CCNV*, 468 U.S. at 299. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Ward*, 491 U.S. at 800 (internal quotations omitted). Just as challenges to time, place, or manner decisions do not permit the courts "to replace the Park Service as manager of" Lafayette Park, *CCNV*, 468 U.S. at 299, they do not permit this Court to replace defendants as stewards of the 1600 Block promenade.

### c) Availability of ample alternative channels of communication

Plaintiffs' preferred medium may be to chalk the pavement, but "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647. What it requires is that a content-neutral regulation, such as the chalking restriction, preserves the speaker's access to ample alternative channels of communication. That requirement was certainly met here.

"Plaintiffs have not been prohibited from directing their speech activity at a specific audience at a specific time and place." *Mahoney*, 454 F. Supp. 2d at 35. To the contrary, they

were given permission to speak through signs, banners, and a demonstration of up to 5,000 people, with no restriction upon their ability to speak aloud, in the very location and times they wanted. Their only limitation was as to the medium they could use on the promenade, "but that did not render the restriction a complete prohibition on speech." *Id.*

Despite the chalking restriction, plaintiffs were free "to engage in a rich variety of expressive activities," such as picketing, marching, carrying signs, singing, shouting, chanting, performing dramatic presentations, and appealing to passers-by. *White House Vigil*, 746 F.2d at 1528. "The content of the message they espouse is theirs and theirs alone; they may express views and employ verbal formulae that would be punished as seditious libel, blasphemy or obscenity in less free societies." *Id.* "In short, the [restriction] leave[s] unaffected a multitude of possibilities for meaningful protest" on the 1600 Block promenade. *Id.*; *CCNV*, 468 U.S. at 299 (finding that ample alternative channels remained for communicating intended political message despite restrictions on sleeping in Lafayette Park).

In sum, the restriction upon plaintiffs' ability to demonstrate was a content-neutral and narrowly tailored means of furthering defendants' significant aesthetic interests in avoiding visual clutter and protecting property, while leaving open ample alternative channels for plaintiffs to communicate their views about abortion. The Court therefore grants summary judgment on Count II's cause of action under the First Amendment's Speech Clause.

### 2. Count IV: FARPSA

Count IV alleges that defendants violated FARPSA because they supposedly failed to comply with Regulation 706.9 when invoking the defacement statute to justify denying plaintiffs permission to chalk the promenade. (Compl. ¶¶ 179-182; *see also* Pls.' Opp'n at 25.) Plaintiff's argument is without merit, for they misunderstand the MPD's authority under FARSPA.

As declared in FARPSA, it is the District's policy to permit expressive assemblies, subject to reasonable restrictions designed to, *inter alia*, "protect . . . property . . . ." D.C. Code. § 5-331.03. The MPD "*shall* recognize and implement" this policy when enforcing restrictions on assemblies, *id.* § 5-331.04(a) (emphasis added), which it can do by imposing reasonable content-neutral time, place, or manner restrictions through the approval of an assembly plan. *See id.* § 5-331.04(b)(1) & (c). Thus, by its plain text, FARPSA *mandates* that the MPD account for the protection of property when imposing time, place, and manner restrictions during the assembly approval process. Defendants' reliance upon the defacement statute was wholly consistent with this mandate.

Regulation 706.9 supplements FARPSA by specifying that proposed assembly plans "shall be approved" if the Chief of Police concludes that nine enumerated criteria have been satisfied. D.C. Mun. Reg., tit. 24, § 706.9(a)-(i). Put another way, the regulation sets forth nine grounds for denying a proposed assembly plan. The last of the nine is the only one to directly reference property interests. *See id.* § 706.9(i). It gives the Chief of Police discretion not to approve an assembly plan if she concludes that the proposed event will "create a substantial possibility of violent, disorderly conduct likely to endanger public safety or to result in significant property damage." *Id.*

Plaintiffs interpret FARPSA and Regulation 706.9 as prohibiting the MPD from "imposing *restrictions* on speech in a public forum" in order to protect property unless there is a chance of "significant property damage" as a result of "violent, disorderly conduct." (Opp'n at 13 (emphasis added).) In keeping with his reading, plaintiffs contend that defendants could not prohibit the use of chalk without justifying it by reference to a reasonable prediction of violence that would cause significant property damage. (*Id.*) This is an incorrect reading of the statutory

regime, because plaintiffs erroneously conflate Regulation 706.9's provisions for denying an assembly plan with the rest of FARPSA's provisions for restricting an assembly plan.

The statutory and regulatory texts clarify that "denials" and "restrictions" are distinct and independent concepts. For example, the MPD must give written notice when denying an assembly plan *as well as* when approving a plan "subject to time, place, or manner restrictions" that are "objectionable to the applicant." D.C. Code. § 5-331.06(c)(3); D.C. Mun. Reg., tit. 24, § 706.12. Similarly, the administrative review procedures contemplate appeals of denials, as well as approvals subject to objectionable restrictions. D.C. Code § 5-331.06(d)(1); D.C. Mun. Reg., tit. 24, § 712.1. The MPD may also impose restrictions on an assembly as it occurs, even though no plan for that event was ever submitted or approved. D.C. Code § 5-331.04(b)(3).

Plaintiffs argue that the restriction on chalking in this instance was an "effective denial" because plaintiffs were prohibited from engaging in the only manner of speech that they wanted to employ. (Opp'n at 2.) This blurring of concepts is inconsistent with FARPSA. A "First Amendment assembly" is defined simply as any "a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views.'" *See* D.C. Code § 5-331.02(1). For purposes of the statute, it is irrelevant what particular medium of expression a demonstrator chooses to employ; an "assembly" is still an "assembly." The approval issued by Commander Crane did, in fact, approve plaintiffs' plan to hold an assembly, *i.e.*, to hold a "gathering conducted for the purpose of [plaintiffs] expressing their . . . religious views." *Id.* The fact that this assembly was "subject to time, place, or manner restrictions" that were "objectionable to the applicant[s]," *id.* § 5-331.06(d)(1), does not mean that the MPD *denied* plaintiffs' request for an assembly.

The Court concludes that FARPSA's general policy, which includes the protection of

property, empowers the MPD to impose reasonable content-neutral restrictions that are far broader than Regulation 706.9's grounds for declining to approve an assembly. Defendants' reliance upon the defacement statute was consistent with the MPD's responsibility under FARPSA to recognize and implement the District's property-protective policy when imposing restrictions through the approval of an assembly plan. Because defendants have not violated FARPSA, Count IV fails as a matter of law.[11]

## III.   COUNTS II AND III: RELIGIOUS FREEDOM CLAIMS

### A.   Count II: First Amendment - Free Exercise Clause

Count II also alleges that defendants' reliance upon the defacement statute violated plaintiffs' First Amendment right to the free exercise of religion. (Compl. ¶¶ 165-72.) Plaintiffs assert that they are "compelled by the teaching of their Christian faith[] to conclude that the status of legalized abortion in the United States[] puts their nation in defiance of God's order for liberty," and that this conclusion motivates their social activism. (*Id.* ¶¶ 43, 45.)

The Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), clarified that under the Free Exercise Clause, a neutral law of

---

[11] Defendants also argue that plaintiffs may not sue for a violation of FARPSA because the statute does not create a private right of action. (*See* Defs.' Reply in Supp. of Mot. ("Reply") [Dkt. 23] at 13-14.) The Court agrees and concludes, in the alternative, that Count IV must be dismissed on this ground. The most important consideration "is whether the legislature intended to create a private right of action." *Dial A Car, Inc. v. Transp., Inc.*, 132 F.3d 743, 744 (D.C. Cir. 1998) (holding that District statute did not create private right of action); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15-16 (1979) ("[W]hat must ultimately be determined is whether [the legislature] intended to create the private remedy asserted . . . ."). FARPSA's legislative history indicates that the D.C. Council ultimately rejected a proposed provision, § 5-321, that would have expressly provided a private right of action. (*See* Reply at 13; *id.*, Attach. 1 at 9; *id.*, Attach. 2 at 35-36; *id.*, Attach. 3 at 9.) A private right of action for statutory violations also appears inconsistent with the statutory scheme, which provides for direct administrative review of the MPD's denials of and modifications to assembly plan proposals. D.C. Code. § 5-331.06(d). *See Cort v. Ash*, 422 U.S. 66, 78 (1975); *accord Dial A Car*, 132 F.3d at 744 (applying *Cort*).

general applicability is not subject to heightened scrutiny. *See, e.g.*, *id.* at 879 ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J. concurring in judgment)); *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008). Plaintiffs do not dispute that the defacement statute is facially neutral. (*See* Opp'n at 18.) They do, however, contend that it is not generally applicable, because the statutory language "permit[s] government officials to engage in selective enforcement of that law in a manner that would burden only those engaging in specified conduct based on religious motivation, and because [d]efendants have threatened to apply that law in precisely such a selective manner to [p]laintiffs' chalk art demonstration." (*Id.* at 19.)

The principle of general applicability prevents the government from pursuing legitimate interests in a manner that has the practical effect of imposing burdens primarily upon conduct motivated by religious belief. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993); *Am. Family Ass'n, Inc. v. F.C.C.*, 365 F.3d 1156, 1171 (D.C. Cir. 2004). Heightened scrutiny of even a facially neutral law is appropriate if the law advances governmental interests in a "substantial[ly]" "underinclusive" way that "fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [the prohibited religiously motivated conduct] does." *Church of Lukumi*, 508 U.S. at 543 (holding that ordinances prohibiting ritual slaughter of animals were not of general applicability). However, where a law does not have the effect of targeting religious speech "to an extreme degree," and it does not impose "extreme burdens [that] are not related to the legitimate governmental interests served by the regulation," then it does not run afoul of the general

applicability requirement.  *Am. Family Ass'n*, 365 F.3d at 1171.

As discussed, the defacement statute rationally advances the District's substantial interests in promoting aesthetics and protecting property.  It contains no exemptions that would show nonreligious defacement more lenience than religiously motivated defacement.  There is also no evidence that any request to chalk the 1600 Block promenade, whether motivated by secular or religious beliefs, has been granted under FARPSA.  There is therefore no basis to argue that the defacement statute has been selectively enforced to prohibit religiously motivated defacement in the unique location of the White House area while letting nonreligious defacement in the vicinity go unchallenged.  If anything, defacement motivated by secular political purposes in that area has been prosecuted, *see Bohlke*, 116 Daily Wash. L. Rep. at 1697 n.2, while Rev. Mahoney has not even been charged.  Accordingly, plaintiffs' attack upon the general applicability of § 22-3312.01 fails.  As a result, although the statute incidentally affects religiously motivated action, plaintiffs cannot raise any free exercise challenge to the law under *Smith*'s general rule.  *See* 494 U.S. at 878-81; *see also Kaemmerling*, 553 F.3d at 677.[12]

## B.  Count III: RFRA

Count III alleges that defendants violated plaintiffs' rights under RFRA.  (Compl. ¶¶ 173-178.)  RFRA was enacted as a congressional response to the Supreme Court's decision in *Smith*, and it "expressly adopted the compelling interest test," rejected by *Smith*, "'as set forth in

---

[12] In the alternative, plaintiffs contend that because their claim involves religiously motivated expression that implicates both the Free Exercise and Speech Clause, this action presents a "hybrid situation" as discussed in *Smith*, 494 U.S. at 881-82 & n.1, such that § 22-3312.01 would be subject to heightened scrutiny.  (*See* Pls.' Opp'n at 19-20.)  Plaintiffs may not, however, raise a "hybrid claim," because they do not have an independently viable claim under the Speech Clause.  *See Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001)) ("For this argument to prevail, one would have to conclude that although the regulation does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one.  But in law as in mathematics zero plus zero equals zero." (citations omitted)).

*Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972).'"

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (quoting

42 U.S.C. § 2000bb(b)(1)).  Under RFRA, the government[13] may not "substantially burden a

person's exercise of religion" unless "it demonstrates that the application of the burden to the

person" is both "in furtherance of a compelling government interest" and "is the least restrictive

means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1; *Boardley v.*

*U.S. Dep't of Interior*, 605 F. Supp. 2d 8, 14 (D.D.C. 2009).

 RFRA defines "exercise of religion" to include "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief."  42 § 2000bb-2(4) (incorporating

definition found in § 2000cc-5(7)(A)).  "A litigant's claimed beliefs 'must be sincere and the

practice[] at issue must be of a religious nature.'"  *Kaemmerling*, 553 F.3d at 677 (quoting

*Levitan v. Ashcroft,* 281 F.3d 1313, 1320 (D.C. Cir. 2002)). "Because the burdened practice need

not be compelled by the adherent's religion to merit statutory protection," what matters is not

"the centrality of the particular activity to the adherent's religion but rather . . . whether the

adherent's sincere religious exercise is substantially burdened."  *Id.*  A substantial burden exists

when government action puts "'substantial pressure on an adherent to modify his behavior and to

violate his beliefs . . . .'"  *Id.* (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).  By

contrast, "[a]n inconsequential or *de minimis* burden on religious practice does not rise to this

level, nor does a burden on activity unimportant to the adherent's religious scheme."  *Id.*

 Plaintiffs argue that "the threat of enforcement of criminal sanctions under D.C. Code §

22-3312.01 as to [p]laintiffs' planned chalk art demonstration imposed . . . 'substantial pressure'

---

[13] Although RFRA no longer applies to state governments, *see City of Boerne v. Flores*, 521 U.S. 507 (1997), it continues to apply to the District of Columbia.  *See* 42 U.S.C. § 2000bb-2(1) & (2).

on [p]laintiffs in deciding whether to follow through with their religious convictions on this occasion." (Pls.' Opp'n at 22.) The Court accepts plaintiffs' representations that they are motivated by sincerely held religious beliefs to engage in the practice of "prayerfully challeng[ing]" President Obama on the issue of abortion by "express[ing] prayers, thoughts, views[,] and hopes" to him. (Compl. ¶¶ 54-55.) But plaintiffs do not allege that it is their sincerely held religious belief that they should express those views to the president through the specific medium of chalk or in the specific location of the 1600 Block promenade. (*See generally id.* ¶¶ 38-45, 53-55.)

Rather, the complaint alleges that "many like-minded individuals" were going to be in the District area on January 22, 2009 "to express continued opposition" to abortion on the anniversary of the *Roe* decision, and that plaintiffs "decided to organize and conduct their chalk art demonstration" "[w]ith that in mind . . . ." (Compl. ¶¶ 57-60.) Plaintiffs acknowledge that chalk art is only "part of" their public religious and political expression. (*Id.* ¶ 56.) The complaint further clarifies that plaintiffs do not exclusively associate the medium of chalk art with their religious opposition to abortion, because they allegedly engaged in chalking demonstrations in solidarity and support of "the persecuted members and adherents of Falun Gong in Communist China." (*Id.* ¶ 56(c)(iv).)

It is clear that these allegations are insufficient to support a claim that the restriction on plaintiffs' use of chalk pressured them "to modify [their] behavior *and* to violate [their] beliefs." *Thomas*, 450 U.S. at 718 (emphasis added). Rather, it only required that they modify their non-religious choice of expressive medium or location. *Compare Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001)) (finding no substantial burden in restriction upon plaintiffs' ability to sell T-shirts on National Mall, because plaintiffs "merely alleged that it is their vocation to

spread the gospel by 'all available means'"), *with O Centro*, 546 U.S. at 427 (considering

substantial burden caused by federal ban on sacramental use of tea made from natural

hallucinogens), *and Comanche Nation v. United States*, No. 08-CV-849, 2008 WL 4426621, at

*17 (W.D. Okla. Sept. 23, 2008) (finding substantial burden where planned construction of

government facility would obstruct Native American plaintiffs' view of religiously significant

landscape and thereby disrupt traditional religious practices). Plaintiffs remain free to act in

accordance with their beliefs. The chalking restriction is, "'at most[,] a restriction on one of a

multitude of means'" that plaintiffs can use in order to engage in their practice of prayerful

challenge. *Boardley*, 605 F. Supp. 2d at 14 (quoting *Henderson*, 253 F.3d at 17). As such, it

does not substantially burden their exercise of religion, and Count III fails as a matter of law.

## V.      COUNT V: EQUAL PROTECTION CLAIM

Count V alleges that defendants violated plaintiffs' equal protection rights under the Fifth

Amendment's Due Process Clause. (Compl. ¶¶ 183-86.) Plaintiffs contend that in preventing

them from applying chalk to the pavement in front of the White House, the District treated them

differently than other "similarly situated" persons who have been permitted to chalk other

sidewalks or roadways located elsewhere in the District. (Pls.' Opp'n at 25-26.) As already

noted, the area near the White House is a unique location for First Amendment activity, *White

House Vigil*, 746 F.2d at 1533, so the fact that defendants have permitted demonstrators to chalk

in other locations does not make them "similarly situated" to plaintiffs.

Permission to chalk on the 1600 Block promenade has not been granted under

FARPSA.[14] (*See* Defs.' SMF ¶ 9; TRO Hr'g Tr. at 50:1-10.) And it cannot be disputed that the

---

[14] For this reason, plaintiffs cannot base their equal protection claim on the fact that the
District and the Armed Forces Inaugural Committee were permitted to mark the surface with
"some substance" in January 2005. (Pls.' Opp'n at 27.) FARPSA did not go into effect until

defacement statute has, in fact, previously been applied to defacing conduct in that vicinity.  *See Bohlke*, 116 Daily Wash. L. Rep at 1700.  Plaintiffs therefore cannot show that "anyone who was similarly situated to them . . . was not similarly treated."  *Mahoney*, 454 F. Supp. 2d at 37 (granting summary judgment for defendants); *see also News Am. Publ'g., Inc. v. FCC*, 844 F.2d 800, 809 (D.C. Cir. 1988) (applying requirement that "government [must] afford similar treatment to similarly situated persons" to Fifth Amendment equal protection claim of discrimination on the basis of speech).  Because there is no genuine issue of material fact, defendants are entitled to summary judgment on Count V.

## VI.     COUNT VI: CLAIMS ARISING FROM THE JANUARY 24, 2009 DEMONSTRATION

Count VI alleges that an unidentified "John Doe" MPD officer violated Mahoney's constitutional and statutory rights when he stopped Mahoney from chalking the 1600 Block promenade on January 24, 2009, required Mahoney to identify himself, and seized the chalk that he was using.  (Compl. ¶¶ 132-138, 187-98.)  Because defendants properly relied upon the defacement statute when imposing a reasonable place and manner restriction to restrict Mahoney from chalking in front of the White House, the unidentified MPD officer's efforts to prevent Mahoney from violating those restrictions could not abridge Mahoney's rights under the First Amendment, Fifth Amendment, or RFRA.  *See, e.g.*, *Mahoney*, 454 F. Supp. 2d at 32-39 (granting summary judgment to defendants on claim by Rev. Mahoney and others that police officers violated their rights under First Amendment, Fifth Amendment, and RFRA when restricting or arresting them for seeking to demonstrate protests outside "controlled access area"

---

April 2005, and its assembly plan approval process did not exist during the 2005 Inauguration. Moreover, the line that was drawn along Pennsylvania Avenue for the inaugural parade does not constitute speech, which "requires both some intent to convey meaning and some meaningful effect."  *United States v. Grace*, 778 F.2d 818, 821 (D.C. Cir. 1985).

near annual Red Mass ceremony).  Moreover, even if it could be argued that the officer's actions constituted a search or seizure under the Fourth Amendment, which it cannot, the officer had probable cause to take action after observing Mahoney chalking the promenade in violation of a criminal defacement statute.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").  Mahoney therefore fails to state claims under the Constitution or RFRA, and Count VI will be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion.  A separate Order will accompany this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 30, 2009